IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

H&R BLOCK FINANCIAL ADVISORS, INC.     :
                                       :
            Plaintiff,                  :
                                       :
      v.                                :     No.
                                       :
                                       :
J. DEREK MAJKOWSKI, JUSTIN ROMERO,     :
and GEORGE SHIRLEY                      :
                                       :
            Defendants.                 :

MEMORANDUM IN SUPPORT OF
H&R BLOCK FINANCIAL ADVISORS, INC.'S
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTIVE RELIEF

**I.**            **PRELIMINARY STATEMENT OF FACTS**

This claim for injunctive relief arises from the breach of contract by Defendants J. Derek Majkowski ("Majkowski"), Justin Romero ("Romero"), and George Shirley ("Shirley") (collectively the "Defendants"), and from Defendants' unlawful misuse of information relating to H&R Block Financial Advisors, Inc. ("HRBFA") customer accounts representing approximately **$155 million** in assets under HRBFA management and more than **$650,000** in commissions for HRBFA in 2005 alone, and their attempt to solicit and otherwise divert these accounts, commission revenues, and assets to their new employer, SunTrust Investment Services, Inc. ("SunTrust"). Each of the Defendants had signed specific agreements with HRBFA prohibiting them from soliciting clients to follow them to a competitor firm, and from misusing or disclosing confidential HRBFA customer information. (See Exhibits "A" – "C" to Complaint).

On January 10, 2006, Defendants resigned from HRBFA after being confronted about whether they were planning to leave HRBFA to join a competitor firm. Defendant

Majkowski was the Branch Manager of HRBFA's Washington, D.C. branch office. He also was a producing broker who worked as a member of a team of financial advisors, along with Defendants Shirley and Romero. On January 10, 2006, Christopher Warren, the HRBFA regional manager responsible for the region including Washington, D.C., was informed by a HRBFA client that Defendant Romero – while still working as a full time employee and registered representative of HRBFA – had called the client, told the client that the team was leaving HRBFA for SunTrust on Friday, January 13, 2006, and had asked the client to follow them to SunTrust. When HRBFA initially asked Mr. Majkowski about this by telephone, Mr. Majkowski simply said "no comment" and hung up. A short while later, Michael Brezovec, Mr. Majkowski's immediate supervisor, arrived in the Washington office. He immediately met with Majkowski, Shirley and Romero. Mr. Brezovec then placed them on administrative leave pending a resolution of their status. Majkowski, Shirley and Romero then immediately printed, signed and tendered resignation letters and left the office. Although they did not acknowledge where they were going, HRBFA has since confirmed that they have, in fact, joined SunTrust.

In the short time since the Defendants' secret plans for mass defection came to light, HRBFA has learned from approximately 10 or more additional clients that – while the Defendants were still full time employees and agents of HRBFA, and still owing HRBFA a duty of undivided loyalty -- the Defendants contacted and solicited these additional clients to follow them to SunTrust. Moreover, despite his heightened duties of loyalty as a Branch Manager, it now is clear that Majkowski was in the process of coordinating the defection of a team of producers representing more than 60% of the 2005 revenues of the office he managed. It also is clear that his plan was to spring this mass defection on HRBFA on Friday, January 13 – the Friday of the three-day President's Day weekend – so that the Defendants would be free to solicit

HRBFA clients for at least three business days before HRBFA could file any action with the Court seeking an injunction to stop them.

In fact, it appears that the Defendants are still trying to "fly under radar" in the hopes that HRBFA will be stymied by the three-day weekend in its efforts to obtain prompt injunctive relief. Although they resigned from HRBFA on Tuesday, January 10, they still have not transferred their licenses from HRBFA to SunTrust. The Defendants may believe that HRBFA does not know where they are employed and what their plans are, and it appear that they may be delaying the publicly observable act of transferring their licenses until Friday afternoon so that they (a) have sufficient time to prepare a mass solicitation mailing to HRBFA's customers, and (b) can send out that mailing suddenly on Friday afternoon, at which point HRBFA will not be able to take any action to stop the mailing or the follow-up telephone campaign over the weekend.

The Defendants have already shown that their intentions are to pirate away HRBFA's clients and business. They began soliciting clients before they had resigned from HRBFA, before they had notified HRBFA of their intent to resign, while Majkowski was employed as HRBFA's Washington, D.C., branch office manager, and while all three Defendants were full time employees and registered representatives of HRBFA owing a duty of loyalty to act faithfully in the best interests of HRBFA. It is imperative that the Defendants now be prohibited from soliciting HRBFA clients, and that they be ordered to return HRBFA confidential client information, before the upcoming President's Day three-day weekend.

By their conduct, Defendants have not only engaged in unfair competition and misuse of trade secret information, but they have also egregiously breached their duties of loyalty

and have violated the express terms of the employment agreements they signed as a condition of their employment with HRBFA. (See Exhibits "A", "B" & "C" to Complaint).

Specifically, as a condition of Majkowski's, Romero's and Shirley's employment with HRBFA, they each signed an agreement – Majkowski's was entitled *Stockbroker Trainee Agreement*, Romero's was entitled *Financial Advisor Employment Agreement and Restrictive Covenants*, and Shirley's was entitled *Stockbroker Trainee Employment Agreement and Restrictive Covenants* (together the "Agreements") (copies are attached as Exhibits "A" - "C" to the Complaint)[1] The Agreements (a) confirmed the confidentiality of HRBFA's records and prohibited the Defendants from communicating to third parties the contents of any records belonging to HRBFA, and (b) prohibited the Defendants from soliciting or contacting any HRBFA customers with whom they came into contact during their employment with HRBFA. (See Exhibit "A" to Complaint at ¶¶6 & 8(A); Exhibit "B" to Complaint at ¶¶ 7 & 9(A); Exhibit "C" to Complaint at ¶¶3 & 4).

In addition, in their Agreements, the Defendants *expressly agreed* to the issuance of injunctive relief in the event they breached the terms of their HRBFA contracts. (See Exhibit "A" to Complaint at ¶ 10; Exhibit "B" to Complaint at ¶ 11; Exhibit "C" to Complaint at ¶ 8).

In consideration of the above covenants by Defendants, HRBFA agreed to, and in fact did, employ and compensate Defendants, provide training, provide Defendants with employment related benefits, and provide Defendants with HRBFA sales support, operational systems, research and investment recommendations, clearing and financial services, HRBFA goodwill and reputation, and opportunities to develop relationships with customers, as well as

---

[1] At the time Shirley and Majkowski signed their Agreements, H&R Block Financial Advisors, Inc. was known as Olde Discount Corporation. The Plaintiff, H&R Block Financial Advisors, Inc., is the same corporation, but has undergone a name change.

4

eligibility for customer referrals, including but not limited to leads from the HRBFA affiliate companies, and/or other customer leads and sales advantages resulting from HRBFA goodwill, reputation, and name recognition.

## II.    HRBFA IS ENTITLED TO INJUNCTIVE RELIEF

Federal and state courts throughout the country have granted securities firms injunctive relief enforcing the same or substantially similar contractual and common law duties under virtually identical circumstances, including at least two published decisions by Judges of this Court in Morgan Stanley DW, Inc. v. Rothe, 150 F. Supp.2d 67, 74-77 (**D.D.C. 2001**), and Merrill Lynch v. Schultz, 2001 WL 1681973 (**D.D.C. 2001**), as well as affirmances by the Fourth, Fifth, Seventh, Tenth, and Eleventh Circuits in Merrill Lynch v. Bradley, 756 F.2d 1048 (4th Cir. 1985); Salvano v. Merrill Lynch, 999 F.2d 211 (7th Cir. 1993); Merrill Lynch v. Dutton, 844 F.2d 726 (10th Cir. 1988); Ruscitto v. Merrill Lynch, 777 F. Supp. 1349 (N.D. Tex.), aff'd 948 F.2d 1286 (5th Cir. 1991), cert. denied, 112 S. Ct. 1994 (1992); Merrill Lynch v. Hagerty, 808 F. Supp. 1555 (S.D. Fla. 1992), aff'd, 2 F.3d 405 (11th Cir. 1993). State appellate courts are in accord. See Leake v. Merrill Lynch, 623 N.Y.S.2d 229 (N.Y. App. Div. 1995); Merrill Lynch v. Moose, 528 A.2d 1351(Pa. Super. 1987), app. denied 542 A.2d 1370 (Pa. 1988).

Similar results have been reached by numerous trial courts throughout the country, Morgan Stanley v. Siegel, 2005 WL .1367052 (M.D. Fla. 2005); Merrill Lynch v. McLafferty, 287 F. Supp.2d 1244 (D. Haw. 2004); Merrill Lynch v. Bushaw, 2004 WL 1238969 (N.D. Tex. 2004); Merrill Lynch v. Dunn, 191 F. Supp.2d 1346 (M.D. Fla. 2002); Merrill Lynch v. Lovekamp, 2001 WL 810749 (N.D. Fla. 2001); Merrill Lynch v. Chung, 2001 WL 283083 (C.D. Cal. 2001); Merrill Lynch v. Napolitano, 85 F.Supp.2d 491 (E.D. Pa. 2000); Merrill Lynch v. Ran, 67 F. Supp.2d 764, 780 (E.D. Mich. 1999); Merrill Lynch v. Cross, 1998 WL 122780 at *2

(N.D. Ill. 1998); Merrill Lynch v. Rahn, 73 F. Supp.2d 425, 428 (S.D.N.Y. 1999); Merrill Lynch

v. Rodger, 75 F. Supp.2d 375 (M.D. Pa. 1999); IDS Life Insurance Co. v. Sun America, 958 F.

Supp. 1258, 1279-80 (N.D. Ill. 1997); Merrill Lynch v. Masri, 1996 WL 283644 (E.D. Pa 1996);

Merrill Lynch v. Orbach, 1994 WL 900431 (E.D. Mich. 1994); IDS Life Ins. Co. v. Smithson,

843 F. Supp. 415, 418 (N.D. Ill. 1994); Johanneman v. Merrill Lynch, 1993 WL 835533 (E.D.

Ky. 1993); Merrill Lynch v. Grall, 836 F. Supp. 428 (W.D. Mich. 1993); Merrill Lynch v.

Wright, 1993 WL 13036199 (N.D. Tex. July 1993); Merrill Lynch v. Wright, 1993 WL

13044458 (N.D. Tex. June 2003); Merrill Lynch v. Kramer, 816 F. Supp. 1242, 1246 (N.D. Ohio

1992); Merrill Lynch v. Patinkin, 1191 U.S. Dist. LEXIS 6210 (N.D. Ill. 1991); Merrill Lynch v.

Barnett, 1990 WL 303428 (W.D. Mich. 1990); Merrill Lynch v. Price, 1989 WL 108412 (Del. Ch.

1989); Merrill Lynch v. Moose, 44 Pa. D. & C.3d 45, 1986 WL 20649 (Pa. Comm. Pleas 1986);

Merrill Lynch v. Roodveldt, 31 Pa. D. & C.3d 432, 1983 WL 964 (Pa. Comm. Pleas 1983). .

      As in all of the foregoing cases, the issuance of injunctive relief in this case is

proper because Merrill Lynch has demonstrated: (i) a substantial likelihood of success on the

merits; (ii) a substantial threat of immediate and irreparable harm which cannot be compensated

by damages; (iii) that greater injury will result from denial of the injunction than from its being

granted; and (iv) that an injunction will not disserve the public interest. See Mova Pharm. Corp.

v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998). These factors "are not considered in isolation

from one another, and no one factor is necessarily dispositive," and the factors "interrelate on a

sliding scale and must be balanced against each other." Morgan Stanley v. Rothe, 150 F.

Supp.2d at 72 (internal quotations omitted). Accordingly, a "particularly strong showing on one

factor may compensate for a weak showing on one or more of the other factors." Id.

      Here, HRBFA has suffered, and continues to suffer, irreparable harm each day

that Defendants are permitted to improperly use HRBFA's confidential client information and improperly solicit HRBFA's clients in breach of their Agreements. Immediate injunctive relief is necessary because the harm to HRBFA is ongoing and cannot be remedied absent such injunctive relief. Thus, HRBFA is entitled to injunctive relief to enforce the non-disclosure and non-solicitation provisions of Defendants' Agreements.

In Merrill Lynch v. Bradley, the Fourth Circuit held under these circumstances that immediate injunctive relief – "within a few days" -- is necessary to avoid irreparable harm to and to maintain the status quo:

> When an account executive breaches his employment contract by soliciting his former employer's customers, a nonsolicitation clause requires **immediate** application to have any effect. **An injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The customers cannot be "unsolicited."**

756 F.2d at 1054 (emphasis added). If the Defendants are permitted to successfully delay relief until after the holiday weekend, HRBFA will have suffered enormous and unwarranted irreparable harm. The Defendants are embarking on a campaign to pirate away clients representing more than 60% of HRBFA's Washington, D.C. office 2005 commission revenue.

A.    **HRBFA Is Likely to Succeed on the Merits**

HRBFA's right to relief is clear, well documented, and set forth in the express language of Defendants' contracts, which contain restrictions nearly identical to those enforced in all of the cases cited above. Defendants contractually agreed to treat HRBFA's records and customer information as strictly confidential and to refrain from contacting or soliciting business from HRBFA's customers to do business with an HRBFA competitor. Despite their explicit contractual obligations, as well as their common law duties of loyalty, Defendants have began soliciting HRBFA clients to follow them to SunTrust before they had even resigned from

HRBFA, and – unless enjoined – will continue to do so in direct violation of their contractual, statutory and common law obligations to HRBFA.  Under applicable District of Columbia and Michigan law, HRBFA is entitled to injunctive relief.[2]

## 1.    Defendants' Breach of Their Non-Solicitation Agreements

HRBFA at this time is seeking an injunction only to enforce that portion of Defendants' post-employment restrictive covenants that prohibit calling upon and soliciting customers, and using or disclosing confidential information.  The applicable restraints are limited to only HRBFA customers[3], and the relief sought is further limited in time to a period of only fifteen (15) days until the parties can appear before a NASD arbitration panel for an expedited hearing on the merits.[4]  Such restrictions are clearly enforceable under District of Columbia and Michigan law.

### a.    Enforceable Under District of Columbia Law.

The relief sought by HRBFA under Defendants' non-solicitation agreements is limited to only those customers and prospects they serviced or whose names became known to them while employed with HRBFA, and is further limited to only a brief period until arbitration can commence.  These restrictions are fully enforceable under District of Columbia law.  See, e.g., Ellis v. James Hurson Assoc., 565 A.2d at 615, 620 (D.C. 1989) (enforcing covenant not to solicit former employee's customers no matter where located); Erikson v. Hawley, 12 F.2d 491 (D.C. App. 1926) (enforcing orthodontist's 10 year covenant not to compete in the District of Columbia); Mercer Management Consulting v. Wilde, 920 F. Supp. 219 (D.D.C. 1996)

---

[2] The Agreements signed by Romero and Shirley call for application of Michigan law.
[3]  There are additional restraints in the Agreements against accepting buy or sell orders from clients that HRBFA is not seeking to enforce injunctively.  There also is a restraint in Majkowski's Agreement prohibiting him from working for a competitor within a fifty mile radius which HRBFA likewise does not seek to injunctively enforce.
[4]  Applicable NASD rules require that, upon issuance of temporary injunctive relief in court, the NASD arbitration panel will endeavor to hold an expedited hearing on the merits of HRBFA's application for permanent injunctive

(upholding 3 year covenant not to do business with Mercer's customers); <u>National Chemsearch v. Harker</u>, 509 F. Supp. 1278 (D.D.C. 1970) (same); <u>Meyer v. Wineburgh</u>, 110 F.Supp. 957, 959 (D.D.C. 1953), <u>approved in</u>, <u>Wineburgh v. Meyer</u>, 221 F.2d 543, 543-44 (D.C. Cir. 1955) (permanently enjoining violation of 5 year non-solicitation covenant).

Indeed, consistent this well-established body of case law, Judge Urbina of this Court in <u>Morgan Stanley v. Rothe</u> issued a temporary restraining order fully enforcing the broker's obligations not to solicit clients or misuse customer information, nothing that "the court views the agreement as a fair-minded contract that Morgan Stanley designed to prevent potentially harmful interference with its crucial client base." <u>Rothe</u>, 150 F. Supp.2d at 74 (<i>citing</i> <u>Citicorp Investment Services v. Mason</u>, No. 96-0353 (NHJ) (D.D.C. 1996)).

Similarly, noting that "[i]t is undisputed in this case that such nonsolicitation clauses are fully enforceable under D.C. law," Judge Hogan concluded that an injunction was appropriate to enforce the broker's contractual obligations in <u>Merrill Lynch v. Schultz</u>, 2001 WL 1681973 at *2, n. 2 (<i>citing</i> <u>Ellis v. James Hurson Assoc.</u>, 565 A.2d 615, 620 (D.C. 1989)).

In addition, HRBFA does not seek to prevent Defendants from earning their livings as "stockbrokers." Indeed, "[t]here is nothing in the agreement which prohibits [the Defendants] from continuing with [their] occupation as a broker in the securities industry." <u>Merrill Lynch v. Kramer</u>, 816 F. Supp. 1242, 1248 (N.D. Ohio 1992). As Judge Green recognized in <u>Mercer Management v. Wilde</u>, under District of Columbia law "a 'restraint is easier to justify . . . if the restraint is limited to the taking of his former employer's customers as contrasted with competition in general.'" 920 F. Supp. at 237. Just as in <u>Mercer</u>, HRBFA seeks only to enjoin Defendants from earning a living by soliciting HRBFA customers, a condition to

relief within fifteen (15) days. <i>See</i> NASD Code of Arbitration Procedure, Rule 10335.

which they specifically agreed.

**b.    The Agreements are Enforceable Under Michigan Law.**

The Agreements are equally enforceable under Michigan law, which is the law that

the contracts stipulate should apply.  In <u>Robert Half Intern., Inc. v. Van Steenis</u>, 784 F. Supp. 1263

(E.D. Mich. 1991), the Michigan federal court upheld a similar non-disclosure and non-

solicitation restriction and emphasized that "the Michigan Legislature has specifically enacted

that covenants not to compete in employment agreements are not only enforceable, <u>but also

specifically enforceable by injunctions</u>."  784 F. Supp. at 1271 (emphasis added).  Applying this

clear law, the Michigan courts have repeatedly granted injunctions to enforce securities industry

covenants not to solicit customers.  <u>See</u>, <u>e.g.</u>, <u>Merrill Lynch v. Ran</u>, 67 F. Supp.2d 764, 775 (E.D.

Mich. 1999); <u>Orbach v. Merrill Lynch</u>, 1994 WL 900431 (E.D. Mich. 1993); <u>Merrill Lynch v.

Grall</u>, 836 F. Supp. 428 (W.D. Mich. 1993); <u>Merrill Lynch v. Barnett</u>, 1990 WL 303428 (W.D.

Mich. 1990).

The Michigan Legislature specifically <u>repealed</u> an older statute that once

prohibited covenants <u>not to compete</u> in favor of legislation that deemed such covenants entered

into <u>after</u> March 29, 1985 to be specifically valid and enforceable.  <u>See</u> M.C.L. § 445.774a.

Defendants executed their HRBFA employment agreements after 1985.  Moreover,

nonsolicitation agreements, such as the agreement in this case, have never been subject to the

pre-1985 restrictions against enforcement of non-*compete* agreements -- rather, non-solicitation

agreements have long been held entirely enforceable under Michigan law.  <u>See</u>, <u>e.g.</u>, <u>Rehmann,

Rotson & Company v. McMahon</u>, 466 N.W. 2d 325, 328 (1991) (non-solicitation agreement

upheld because "[t]aken as a whole, we find the agreements restrict defendants from contacting

or performing services for former clients of Rehman Rotson, subject to certain exceptions

10

detailed in the preceding paragraph.  <u>The agreements do not restrict defendants from 'engaging in any avocation.</u>'" (emphasis added).

Indeed, Michigan courts have noted the reasonableness of a non-solicitation restriction in the stockbroker context, emphasizing that under the injunctive relief requested in this case a "Defendant is not barred from continuing his employment as a stockbroker. . . ." <u>Merrill Lynch v. Barnett</u>, 1990 WL 303428 (W.D. Mich. 1990).  <u>See also Hegarty</u>, 808 F. Supp. at 1560 ("The harm to Defendant . . . is mitigated by his ability to solicit new clients. . .").

### c.    HRBFA 's Client Information Is Entitled To Trade Secret Protection

Even in the absence of an express written contract, injunctive relief is appropriate to protect HRBFA's trade secret customer list.  The District of Columbia has adopted the <u>Uniform Trade Secrets Act</u>, D.C. Code §§ 48-501- - 48-510, which defines a trade secret as follows:

> [I]nformation, including a formula, pattern, <u>compilation</u>, program, device, method, technique, or process, that:
>
> (A)  Derives actual or potential, <u>independent economic value from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use</u>; and
>
> (B)  Is the subject of reasonable efforts to maintain its secrecy.

D.C. Code § 48- 501 (4) (emphasis added).

The "economic value" of HRBFA's customer information is enormous. Defendants were servicing and in contact with hundreds of HRBFA accounts representing more than $650,000 in commission revenues for 2005 alone.  HRBFA's customer information is neither generally known to, nor readily ascertainable by *proper means* by, any of HRBFA's

competitors who could obtain economic value from its disclosure or use.  In addition, HRBFA has instituted strict security procedures to maintain the secrecy of its customer list, including by requiring HRBFA employees to sign confidentiality and non-disclosure agreements such as those signed by the Defendants in this case.  (See Exhibits "A" "B" & "C" to Complaint; see also Affidavit submitted herewith (outlining additional security measures)).  HRBFA's customer list clearly qualifies as a trade secret under the Act.

Courts throughout the country repeatedly have accorded trade secret status to the customer lists of securities brokerage firms and have issued injunctive relief to prevent the unlawful misappropriation and misuse of these brokerage firms' customer lists.  Indeed, Judge Urbina of this Court specifically found that another securities firm's customer list was a trade secret and issued an injunction prohibiting solicitation of clients in Morgan Stanley v. Rothe, 150 F. Supp.2d at 76.  In Rothe, Judge Urbina noted the line of cases from other Uniform Trade Secrets Act states finding securities firms' customer lists to be trade secrets, and then unequivocally held that:

> To the extent that this district has not had occasion to address the issue, **this court now holds that the customer lists of a financial services firm deserve trade-secret status under D.C. Code §. 48-501.**

150 F. Supp. 2d at 76 (emphasis added) (*citing as examples* Merrill Lynch v. Zimmerman 1996 WL 707107 (D. Kan. 1996) ; IDS Financial Servs. v. Smithson, 843 F. Supp. 415, 418 (N.D. Ill. 1994)).

The cases cited by Judge Urbina are only two of a great many decision by courts applying the Uniform Trade Secrets Act and similar *Restatement* standards and finding that securities firms' customer lists merit trade secret protection.  See, e.g., Merrill Lynch v. Lovekamp, 2001 WL 810749 (S.D. Fla. 2001) (finding client list to be a trade secret and issuing

injunctive relief to prevent solicitation even in absence of any express non-solicitation covenant); Merrill Lynch v. Ran, 67 F. Supp.2d 764, 775 (E.D. Mich. 1999) ("Merrill Lynch is entitled to trade secret protection under Michigan's Uniform Trade Secrets Act"); Merrill Lynch v. Dunn, 191 F. Supp.2d 1346, 1351 (M.D. Fla. 2002) ("Plaintiff has shown that its customer lists and the information contained therein are trade secrets"); Merrill Lynch v. Davis, 1998 WL 920328 at * 1 (N.D. Tex. 1998) ("This court has routinely held that Merrill Lynch's customer lists qualify as trade secrets."); Merrill Lynch v. Chapman, 1998 WL 792501 at * 3 (N.D. Tex. 1998) (same); *Merrill Lynch v. Cross*, 1998 WL 122780 at *2 (N.D. Ill. 1998) ("Customer lists are entitled to trade secret protection under Illinois law."); Merrill Lynch v. Zimmerman, 1996 WL 707107 at *2 (D. Kan. 1996); IDS Life Insurance Co. v. Sun America, 958 F. Supp. 1258, 1279-80 (N.D. Ill. 1997) ("In this case, plaintiffs claim that Defendants are in possession of plaintiffs' records of customer names, addresses, and investment characteristics and are using that information to solicit and serve plaintiffs' customers.  We find that plaintiffs' customer lists and files are likely to constitute trade secrets."), aff'd in part, vac. in part on other grounds, 136 F.3d 537 (7th Cir. 1998); IDS Life Ins. Co. v. Smithson, 843 F. Supp. 415, 418 (N.D. Ill. 1994) ("Additionally, § 2(d) of the Illinois Trade Secrets Act, ILCS 1065/2(d), protects IDS's interest in the confidential information such as customer identity, addresses, and financial data . . . An injunction is therefore appropriate to protect IDS's proprietary interest in these trade secrets and to prevent the secrets from being disclosed to competitors or unjustly used by Smithson for his own benefit."); Orbach v. Merrill Lynch, 1994 WL 900431 at *6 (E.D. Mich. 1994) (applying Restatement law and holding that "[t]he Michigan Court of Appeals . . . has held that Merrill Lynch's client list is the property of Merrill Lynch . . . [Merrill Lynch] has a strong likelihood of success on the merits of this claim."); Merrill Lynch v. Kramer, 816 F. Supp. 1242, 1246 (N.D. Ohio 1992) ("Even

absent a specific contractual provision, Merrill Lynch's customer list is entitled to trade secret protection under Ohio law."); Ruscitto v. Merrill Lynch, 777 F. Supp. at 1354, aff'd, 948 F.2d 1286, cert. denied, 112 S. Ct. 1994 (emphasizing that injunctive relief is necessary to protect the "goodwill and trade secrets" of Merrill Lynch);. Merrill Lynch v. Hegarty, 808 F. Supp. at 1555, 1558 (S.D. Fla. 1991) ("Accordingly, Plaintiff has a legitimate interest in the [customer] list because it is a trade secret"), aff'd, 2 F.3d 405 (11th Cir. 1993).[5]

### d.    Defendants' Consent to Injunctive Relief is Specifically Enforceable

Defendants' express consent to injunctive relief is a specifically enforceable term of the parties' Agreements, and is a core term of the manner in which they agreed to arbitrate any dispute relating to the Agreements. A party's contractual agreement to comply with the terms of his/her contract pending arbitration is specifically enforceable. See Organizing Committee for the 1998 Goodwill Games v. Goodwill Games, Inc., 919 F. Supp. 21, 26 (D.D.C. 1995) (specifically enforcing performance pending arbitration where the parties' agreed to specific performance in the event of a material breach or threatened material breach). In affirming the injunction issued against a former employee in a securities industry restrictive covenant case, the Tenth Circuit held that:

---

[5]    Nor does it matter whether Defendants took original records, copies, computerized information, transcribed customer lists, or customer information in their memories. The use of Defendants' knowledge of HRBFA's trade secret customer information to HRBFA's competitive disadvantage is an actionable misappropriation of trade secrets if that information is misappropriated in written form or in a former employee's memory. See Reusch v. Reusch Int'l Monetary Servs., Inc., 479 A.2d 295, 297 n.3 (D.C. App. 1984) ("[O]nce a customer list is afforded trade secret protection, it is immaterial whether the list was taken or copied or whether it was memorized."). See also, e.g., Stampede Tool Warehouse v. May, 651 N.E.2d 209, 216-17 (Ill. App. 1995) ("That taking does not have to be physical taking by actually copying the names. A trade secret can be misappropriated by physical copying or by memorization."); Allen v. Johar, Inc., 823 S.W.2d 824, 827 (Ark. 1992); Velo-Bind, Inc. v. Scheck, 485 F. Supp. 102, 107 (S.D.N.Y. 1979).

> First, plaintiff is entitled by the employment contract to entry of orders protecting the **status quo. . . .** [T]he entry of the temporary restraining order was appropriate."). Indeed, to counsel's knowledge, <u>every</u> United States Circuit Court of Appeals to consider the issue has enforced a parties' contractual consent to injunctive relief pending arbitration as a term of the parties' "agreement to arbitrate."

<u>Merrill Lynch v. Dutton</u>, 844 F.2d at 727-28. <u>See also</u> <u>Peabody Coalsales v. Tampa Elec. Co.</u>, 36 F.3d 46 (8th Cir. 1994); Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 433 (2d Cir. 1993) ("[w]here a party's request for a **status quo injunction** pending arbitration in grounded in the words of a contract, specific performance analysis is required."); <u>RGI, Inc. v. Tucker Assocs.</u>, 858 F.2d 227, 230 (5th Cir. 1988) ("Where the parties' **contract provides for injunctive relief pending arbitration** . . . the court need not involve itself in balancing the various factors. . . . [I]t was appropriate for the district court to issue the preliminary injunction to insure that the arbitration clause of the contract will be carried out as written.").

In sum, HRBFA clearly is entitled to injunctive relief both to enforce the terms of Defendants' Agreements, and to protect against the conversion and misappropriation of its trade secret customer list and confidential customer information.

**B.    HRBFA Has No Adequate Remedy at Law.**

HRBFA clearly will suffer irreparable harm in the absence of immediate injunctive relief. <u>See</u> <u>Merrill Lynch v. Bradley</u>, 756 F.2d at 1055 (4th Cir. 1985) (holding that a securities firm "faced irreparable non-compensable harm in the loss of its customers."); <u>Merrill Lynch v. Salvano</u>, 999 F.2d 211 (7th Cir. 1993) (holding that removal of customer information and use of it to solicit customers constitutes irreparable harm.); <u>Morgan Stanley v. Rothe</u>, 150 F. Supp.2d at 78 ("The plaintiff has persuaded the court that it would likely suffer irreparable harm in the loss of its customers and by the possibly permanently damaged relationships with its

15

customers."). In fact, injunctive relief is specifically authorized by the District of Columbia Uniform Trade Secrets Act. See D.C. Code §. 48-502(a) ("Actual or threatened misappropriation may be enjoined."). Even without this statutory authorization, however, it is clear that HRBFA will suffer irreparable harm on many different levels unless an injunction is granted.

1. **Incalculable Damages.**

Absent injunctive relief it will be impossible to determine HRBFA's damages with any reasonable degree of certainty because HRBFA's damages necessarily include every future (and currently unknowable) investment in any account solicited or whose information Defendant misappropriated. In Merrill Lynch v. Stidham, 658 F.2d 1098 (5th Cir. 1981), the court held that the defendants'/employees' breach of their employment agreements and misappropriation of their former employer's trade secrets caused irreparable harm:

> The injury here is such that damages could not adequately compensate. Were defendants permitted by the law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. **How such a figure could be arrived at escapes us**.

Id. at 1102 (emphasis added). Accord Merrill Lynch v. Bradley, 756 F.2d at 1055. See also Merrill Lynch v. Salvano, 999 F.2d at 215 ("[T]he available evidence -- indicating that Salvano and Coon took various documents and information pertaining to Merrill Lynch's clients and used that information to solicit Merrill Lynch customers -- sufficiently supports the court's determination regarding irreparable harm and the inadequacy of Merrill Lynch's legal remedy"); Merrill Lynch v. Hagerty, 808 F. Supp. at 1558-60 (S.D. Fla. 1992) (discussing Merrill Lynch's irreparable harm), aff'd, 2 F.3d 405 (11th Cir. 1993).

Defendants previously serviced numerous HRBFA accounts, representing

16

approximately $115 million in assets and more than $650,000 in 2005 commission revenues.  It is impossible to determine at this time the number of HRBFA clients who will be "pirated away" by Defendants.  Nor is it possible to determine with any degree of certainty the commissions each of these HRBFA clients will generate not only this year, but 5, 10 or 20 years into the future. Accordingly, Defendants' breach of their post-termination covenants involves financial loss to HRBFA that is incapable of measurement, requiring the issuance of an injunction to protect HRBFA from irreparable harm.

Courts in other jurisdictions have reached similar conclusions in securities firm cases.  In Merrill Lynch v. Ran, for instance, the Michigan federal court found:

> [T]he loss of customer goodwill can amount to irreparable injury because the damages flowing from such an immeasurable loss are extremely difficult to compute . . . There is simply no way of predicting (1) how clients' portfolios might have grown if not transferred away from Merrill Lynch, (2) what assets existing clients may earn, inherit, or even win over time, nor (3) what potential referrals transferring clients might have made.  The goodwill of Merrill Lynch is an invaluable intangible which, despite defendants' protestations to the contrary, is not easily quantified.  Given the complexities and uncertainties of developing a client base, unless injunctive relief is granted now, the impact of defendants' breaches on Merrill Lynch simply cannot be measured.

67 F. Supp.2d at 779.  See also Merrill Lynch v. Napolitano, 85 F. Supp.2d 491, 497 (E.D. Pa. 2000) ("Because Napolitano took information pertaining to Merrill Lynch's clients and used that information to solicit those clients, the harm to Merrill Lynch is irreparable and a legal remedy is inadequate."); Merrill Lynch v. Rodger, 75 F. Supp.2d 375, 381 (M.D. Pa. 1999); Merrill Lynch v. Rahn, 73 F. Supp.2d 425, 428 (S.D.N.Y. 1999) (finding that because of potential loss of customers, "[Merrill Lynch] will suffer irreparable harm absent a preliminary injunction").

**2.      Loss of Client Confidence and Confidentiality of Client Information.**

Irreparable harm also lies in the fact that HRBFA clients expect their financial

information, their market transactions, and their investment assets to be known only to themselves, HRBFA, and HRBFA employees. If Defendants are permitted to continue their conduct, each client's sensitive financial information will lose its confidentiality. In Morgan Stanley v. Rothe, the court observed that:

> [T]he Agreement seeks to keep the names, personal contact information, and perhaps most importantly, the personal financial information of the plaintiffs' clients confidential by ensuring that if an employee goes from Morgan Stanley to another company, the other company will not suddenly have access to the clients' personal financial data without the clients' permission. If clients begin to feel that their personal information is not safe with the plaintiff, this development might well lead to a loss of trust and goodwill.

Rothe, 150 F. Supp.2d at 78. See also Kramer, 816 F. Supp. at 1247 (if information is allowed to be disclosed, clients "will lose trust and confidence" in the firm). Just as in Rothe and Kramer, injunctive relief is necessary in this case to protect the confidentiality of HRBFA's confidential customer information and records.

### 3. Threat to Office and Workforce Stability.

Immediate injunctive relief also is necessary to protect the stability of the HRBFA Washington, D.C., office and workforce, and to discourage competitor firms from assisting HRBFA's former employees to breach their contractual commitments and to divert HRBFA's trade secret client lists to a competitor. This factor is especially important in this case where Defendant Majkowski, HRBFA's former Branch Manager for its Washington office, has orchestrated a group departure representing more than 60% of the office's 2005 commission production. It is perhaps equally important because it is clear that HRBFA's former regional manager, Michael DePirri, is engaged in a concerted campaign of recruiting HRBFA brokers and has plainly stated that he intends to recruit away a substantial number of additional brokers from

HRBFA. In <u>Merrill Lynch v. Patinkin</u>, the court specifically considered this risk in granting injunctive relief:

> The court believes that the denial of the extension of the TRO under the circumstances presented in this case <u>would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm plaintiff faces, on several levels, is **enormous**</u>.

1991 WL 83163, 1991 U.S. Dist. Lexis 6210 at * 17 (emphasis added). In this case, as in <u>Patinkin</u>, it is crucial that the Defendants not be permitted to engage in further wrongful solicitation of clients, so that other brokers in HRBFA's Washington area offices will not be induced into thinking that they can breach their obligations with impunity, and so that HRBFA's Washington office will not be wrongfully deprived of clients who last year alone represented more than 60% of the office's commission revenues.

In sum, HRBFA faces significant irreparable harm on numerous levels, including the infliction of incalculable damages, a loss of client confidentiality, and a threat to office stability, all of which necessitate the issuance of immediate injunctive relief.

C.  **Return to the Status Quo**

HRBFA seeks to return to the <u>status quo</u> to the extent Defendants shall be required to return all confidential data they have wrongfully diverted or retained following their resignations from HRBFA. A return to the <u>status quo</u> further requires that Defendants be enjoined from continuing to solicit HRBFA's customers. HRBFA emphasizes that it does <u>not</u> seek to prevent Defendants from continuing their present employment in the brokerage industry, even with a nearby competitor. HRBFA, however, does seek an immediate return to the <u>status quo</u> by enjoining Defendants from future attempts to solicit HRBFA customers and by enjoining Defendants from any further misuse and exploitation of HRBFA's customer information.

19

An injunction order from the Court enjoining Defendants from misappropriating the information in HRBFA's trade secret client lists would return the parties to the status quo without any prejudice to Defendants' ability to earn a living. See, e.g., Morgan Stanley v. Rothe, 150 F. Supp.2d at 78 ("Nothing in the record suggests that the defendant's 'right to earn a living' is substantially put at risk."); Ruscitto v. Merrill Lynch, 777 F. Supp. at 1354 ("The present record plainly shows that Merrill Lynch's request is reasonable.  Ruscitto may continue to compete as a stock broker in the same locale.  He is merely restricted for one year from soliciting clients whom he served or whose names became known to him while employed at Merrill Lynch.").

**D.    Granting Injunctive Relief Outweighs Denial And Is In The Public Interest**

The benefit of injunctive relief to HRBFA far outweighs any detriment to Defendants and serves the public interest.  On the one hand, an injunction would protect HRBFA's goodwill, business reputation, and contract rights.  Most importantly, however, "by issuing an injunction, the court serves the public interest in protecting trade-secret client lists and other confidential information, an interest reflected by the adoption of the D.C. Uniform Trade Secrets Act." Rothe, 150 F. Supp.2d at 79.  See also Zimmerman, 1996 WL 707107 at *3 ("[T]here is a strong  public policy in favor of protecting trade secrets."); Kramer, 816 F. Supp. at 1248 ("To deny injunctive relief in this case would . . . jeopardize the integrity of the securities industry to the detriment of the public interest [and] ... would cast doubt on the integrity of contractual agreements.").

By contrast, Defendants have intentionally breached their contractual commitments and have deliberately misappropriated HRBFA's trade secret information and used that information to solicit HRBFA's customers.  Finally, the public interest is served by

enforcement of reasonable contracts and the protection of trade secrets. Indeed, the public's interest is reflected by the enactment of the Trade Secrets Act, which explicitly provides for injunctive relief to prevent against the unauthorized disclosure and use of trade secrets. In Kramer, the federal court in Ohio found that the public interest was served by an injunction prohibiting the employee from soliciting clients and misusing customer information:

> To deny injunctive relief in this case would, in the Court's view, jeopardize the integrity of the securities industry to the detriment of the public interest.
>
> Finally, the public has an interest in the performance of contracts. To deny injunctive relief in this case would cast doubt on the integrity of contractual agreements.
>
> The court is of the opinion that it would be in the public interest to enforce the reasonable terms of employment contracts. Therefore, this factor weighs in favor of Merrill Lynch.

816 F. Supp. at 1249.

The Northern District of Illinois in IDS Life Insurance Co. v. Sun America, summarized the public interest inquiry by observing that "[t]he public has an interest in preventing unfair competition, commercial piracy, misleading solicitations, and in safeguarding the confidentiality of financial records." 958 F. Supp. at 1282. "Consequently," the court observed, "the public's interest has been disserved by defendants' actions" because "[t]he public has no interest in destroying contracts, rewarding theft, and encouraging unethical business behavior." Id. See also Rothe, 150 F. Supp. at 79 (quoting IDS v. SunAmerica).

Indeed, the U. S. Supreme Court has emphasized the importance to the public interest of protecting trade secret business information and in deterring commercial piracy:

> The necessity of good faith and honest, fair dealing is the very life and spirit of the commercial world. **It is hard to see how the public would be benefited by disclosure of customer lists**. . . .

21

> In addition to the increased costs for protection from burglary, wiretapping, bribery, and other means used to misappropriate trade secrets, **there is the inevitable cost to the basic decency of society when one firm steals from another**. A most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable; **the state interest in denying profit to such illegal ventures is unchallengeable**.

Kewanee Oil Corp. v. Bicron Corp., 416 U.S. 470 (1974) (emphasis added).

In this case, as in the above-cited cases, HRBFA seeks only to require Defendants to honor the terms of the Agreements they freely executed, and to enjoin their unlawful diversion and misappropriation of HRBFA's most precious business asset -- its clients.

## III.    EVEN WHEN ARBITRATION IS REQUIRED, HRBFA IS STILL ENTITLED TO INJUNCTIVE RELIEF PENDING ARBITRATION

Even though this dispute ultimately will be resolved in arbitration before the National Association of Securities Dealers, HRBFA still is entitled to injunctive relief pending the outcome in arbitration. Indeed, the NASD has codified HRBFA's right to seek temporary injunctive relief from a court pending arbitration. Specifically, NASD Rule 10335 provides that "parties may seek injunctive relief either within the arbitration process or from a court of competent jurisdiction." (emphasis added). See NASD website, http://www.nasd.com/web /groups/med_arb/documents/mediation_arbitration/nasdw_013098.pdf.

Even where a dispute is ultimately resolved in arbitration, under the present facts and circumstances HRBFA is entitled to injunctive relief pending the outcome in arbitration. This is the holding of every United States Circuit Court of Appeal to consider the issue.[6] The

---

[6] See Teradyne Inc. v. Mostek Corp. 797 F.2d 43 (1st Cir. 1986); Blumenthal v. Merrill Lynch, 910 F.2d 1049 (2d Cir. 1990); Ortho Pharm. Corp. v. Amgen Inc., 887 F.2d 460 (3d Cir. 1989); Bradley, 756 F.2d at 1053-1054; Ruscitto, 777 F. Supp. at 1349, aff'd, 948 F.2d 1286 (5th Cir. 1991); Performance Unlimited v. Questar Pub., 52 F.3d 1373 (6th Cir. 1995); Salvano, 999 F.2d at 211 (7th Cir. 1993); Peabody Coalsales, 36 F.3d at 48 (8th Cir. 1994); PMS Distrib. Co. v. Huber, 863 F.2d 639 (9th Cir. 1988); Dutton, 844 F.2d at 726; Hegarty, 808 F.Supp. at 1561. aff'd, 2 F.3d 405 (11th Cir. 1993).

facts in Bradley, Ruscitto, Blumenthal, and Dutton, were the same as here. In each case, former

employees left their employer and solicited accounts to follow them to their new brokerage firm.

In Merrill Lynch v. Bradley, for example, the Fourth Circuit expressly held that unless a court

issues injunctive relief within a few days "[t]he arbitral process would be a hollow formality

where the arbitral award when rendered could not return the parties to the status quo ante." 756

F.2d at 1053-1054. Similarly, in Blumenthal, Second Circuit reached the identical conclusion:

> Arbitration can become a "hollow formality" if parties are
> able to alter irreversibly the status quo before the arbitrators
> are able to render a decision in the dispute..... A district
> court must ensure that the parties get what they bargained
> for - a meaningful arbitration of the dispute.

910 F.2d at 1053 (emphasis added).

In American Express Financial Advisors v. Thorley, 147 F.3d 229 (2d Cir. 1998),

the Second Circuit considered the interplay of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1

et seq., and Rule 10335. In Thorley, the Second Circuit found that under the FAA and the NASD

Code a district court abuses its discretion if it declines to entertain a request for injunctive relief

where the parties specifically reserved that issue for the court. Id.

The Second Circuit reversed the lower court's refusal to consider the merits of the

plaintiff's motion for temporary injunctive relief, which was based on the district court's belief

that the plaintiff could have obtained such relief just as quickly from the NASD. Id. at 230-31.

The court ruled that "the expectation of speedy arbitration does not absolve the district court of

its responsibility to decide requests for preliminary injunctions on their merits . . . . Nor is this

duty affected by the pro-arbitration policy manifested in the FAA." 147 F.3d at 231 (citations

omitted). In fact, the Second Circuit pointed out that:

> [T]emporary injunctions often foster rather than contradict the
> policy favoring arbitration. In many instances, it is by freezing the

23

> status quo that the meaningfulness of arbitration is best protected. For if events proceed unenjoined, the subject matter of arbitration may be irretrievably altered before an arbitral decision can be reached.

Id. (citations omitted).

These decisions are fully in accord with fundamental FAA case law. As the United States Supreme Court has repeatedly emphasized, the basic tenet of the FAA, 9 U.S.C. §§ 3-4, is to "ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms" and "according to the intentions of the parties." First Options of Chicago, Inc. v. Kaplan, 115 S.Ct. 1920, 1925 (1995); see also Volt Information Sciences v. Leland Stanford, Jr. Univ., 489 U.S. 468, 478 (1988) (the FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."); Dean Witter Reynolds, Inc, v. Byrd, 470 U.S. 213, 219-21 (1985) ("[T[he legislative history of the [FAA] established that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate.").

In light of this overwhelming case law, the NASD Code of Arbitration Procedure, and Defendants' Agreements, it is clear that HRBFA is entitled to injunctive restraints pending arbitration to prevent arbitration from being rendered a "hollow formality" and to preserve the "meaningfulness of the arbitration."

Respectfully submitted,

Robert C. Gill, Esquire
DC Bar No. 413163
SAUL EWING, LLP
1025 Thomas Jefferson Street, N.W.
Suite 425W
Washington, D.C. 20007
(202) 295-6600
(202) 295-6700 (facsimile)

Attorneys for Plaintiff
H&R Block Financial Advisors, Inc.

Of Counsel:

Christopher P. Stief
Saul Ewing LLP
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102
(215) 972-1965
(215) 972-1941 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Temporary Restraining Order and Preliminary Injunction, and memorandum in support thereof, are being served this 12th day of January, 2006, via federal express and facsimile on the following:


Justin Romero
J. Derek Majkowski
George Shirley
c/o SunTrust Investment Services, Inc.
8219 Leesburg Pike
Vienna, Virginia 22182
703-442-1669 (facsimile)


Courtesy copy to the following via federal express and facsimile:

Vernon W. Johnson, III Esquire
Jackson & Campbell
1120 Twentieth St., NW
South Tower
Washington, DC 20036-3437
(202) 457-1678
*Prospective counsel for defendants Justin Romero, J. Derek Majkowski, and George Shirley*


Robert C. Gill