IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

H&R BLOCK FINANCIAL ADVISORS, INC.   :
                                                   Plaintiff,   :

v.   :   No.

J. DEREK MAJKOWSKI, JUSTIN ROMERO,   :
and GEORGE SHIRLEY
                                                   Defendants.   :

## DECLARATION OF MICHAEL BREZOVEC

I, Michael Brezovec, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

### Introduction

1. I am the Complex Manager responsible for a group of offices of H&R Block Financial Advisors, Inc. ("HRBFA"), including the Washington, D.C. office. I submit this Declaration in support of HRBFA's request for a temporary restraining order and preliminary injunctive relief against J. Derek Majkowski, George Shirley and Justin Romero ("Defendants").

2. As the Complex Manager responsible for HRBFA's Washington office, I am responsible for supervision of the Washington, D.C. office Branch Manager, as well as the employees who report to our Branch Manager. I also am responsible for regulatory compliance and implementation of firm policy, and I have familiarity with each employee in the office and general familiarity with the accounts each financial advisor services on behalf of HRBFA.

915026.1 1/12/06

3. I am familiar with the Defendants, and with the facts and circumstances of their departure from HRBFA. I have reviewed the *Stockbroker Trainee Agreement* signed by Majkowski, the *Financial Advisor Employment Agreement and Restrictive Covenants* signed by Romero, and the *Stockbroker Trainee Employment Agreement and Restrictive Covenant* signed by Mr. Shirley (together the "Agreements") (attached as Exhibits "A" – "C" to HRBFA's Complaint), and I am generally familiar with the other records and information relating to the accounts the Defendants serviced while employed at HRBFA.

### The Defendants' Employment with HRBFA

4. Until two days ago, Mr. Majkowski was the Branch Manager for our Washington, D.C. office. As a Branch Manager, Mr. Majkowski's responsibilities involved both compliance oversight and supervision of the financial advisors in the Washington office, including especially the duty to ensure that our group of financial advisors were productive and loyal. Our Branch Managers are the management level employees who are "on the ground" on a day-to-day basis in the office, and we rely on them to be the eyes and ears of the company in the office they are assigned to manage. One of the core duties of a Branch Manager is to be alert to signs of possible defections of key financial advisors, and to warn upper level management if there are any indications that financial advisors may be planning to leave HRBFA for competitor firms.

5. In addition to his role as the primary day-to-day manager of the Washington, D.C. office, Mr. Majkowski also was a producing broker. He headed a team, which included Mr. Shirley and Mr. Romero. The team referred to itself as "The Capitol Group." On Tuesday, January 10, 2006, each of the three Defendants resigned their positions with HRBFA

and joined SunTrust Investment Services, Inc. ("SunTrust"), in its new Tyson's Corner retail brokerage branch office.

6.   Mr. Majkowski and Mr. Shirley were hired by HRBFA in 1994 and 1997, respectively, when the company was known as Olde Discount Corporation. The firm subsequently changed its name to H&R Block Financial Advisors, Inc. Mr. Romero signed his agreement in 2003, when he rejoined HRBFA in its Washington office after having previously worked for HRBFA in Rockville, Maryland. Messrs. Majkowski and Shirley were employed initially as trainees and ultimately as financial advisors. Mr. Romero was hired to join the Majkowski/Shirley, and ultimately took on the role of a fully registered sales assistant helping to service the HRBFA client base assigned to the Capitol Group team. Mr. Majkowski was ultimately promoted to the position of Branch Manager of the Washington office. As with all HRBFA financial advisors, HRBFA compensated the Defendants, provided them with employment related benefits, and provided them with HRBFA sales support, operational systems, research and investment recommendations, clearing and financial services, HRBFA goodwill and reputation, and opportunities to develop relationships with customers, as well as eligibility for customer referrals, including but not limited to leads from the HRBFA affiliate companies, and/or other customer leads and sales advantages resulting from HRBFA goodwill, reputation, and name recognition.

7.   As a result of their employment at HRBFA, and the extensive sales opportunities, support, and goodwill provided to them by HRBFA, the Defendants came to be servicing over 1,000 HRBFA accounts, representing over $150 million in assets under HRBFA management and more than $650,000 in commissions for HRBFA in 2005. In fact, a large portion of this group of clients were pre-existing HRBFA clients that were reassigned to one or

more of the Defendants after the resignation of other financial advisors. The clients serviced by the Defendants represented more than 60% of the 2005 commission revenues of our Washington office, and over 70% of the office's total client assets under management.

8. The Defendants consequently had access to extensive and highly confidential financial information relating to numerous HRBFA customers, including information about their assets, investment histories, securities holdings and the like. In addition, for certain clients who have given such permission, HRBFA financial advisors may also have access to confidential and highly sensitive federal and state tax records from HRBFA's tax preparation affiliate.

### The Defendants' Agreements Signed with HRBFA

9. In return for the opportunities, support, and goodwill provided to them by HRBFA, the Defendants agreed to be bound by the terms of their Agreements. Specifically, they agreed that they would not solicit or call upon HRBFA accounts to follow them to a competitor firm if they ever decided to leave HRBFA. They also agreed to maintain the confidentiality of, and not to misuse or disclose, any information pertaining to HRBFA customers. (See Exhibit "A" to Complaint at ¶¶6 & 8(A); Exhibit "B" to Complaint at ¶¶ 7 & 9(A); Exhibit "C" to Complaint at ¶¶3 & 4).

### The Defendants' Plans for an *En Masse* Friday Afternoon Resignation Are Uncovered and They Resign Abruptly

10. Earlier this week, on Monday, January 10, 2006, my superior, Christopher Warren, received a telephone call from an HRBFA client that was serviced by the Majkowski/Shirley/Romero team. The client told Mr. Warren that – while still working as an

HRBFA employee and registered representative – Mr. Romero had called the client, told the client that he and Messrs. Majkowski and Shirley were leaving HRBFA for SunTrust on Friday, January 13, and had asked the client to transfer his account to SunTrust to continue working with them.

11. Shortly after Mr. Warren informed me of this on Monday, January 10, Mr. Warren called Mr. Majkowski to ask him whether he was, in fact, leaving us to join a competitor firm. Mr. Majkowski's only response was to say "no comment", and then he hung up the phone. This obviously raised our level of concern even higher that our Branch Manager in Washington, D.C. might be preparing to coordinate an exodus from the firm. Mr. Warren informed me of this development, and I immediately drove to Washington from my home office in Rockville, Maryland, so that I could talk to Mr. Majkowski, Mr. Shirley and Mr. Romero in person. After meeting with them that same day, January 10, I told them they were being placed on administrative leave until we had an opportunity to sort things out. They immediately went to their offices, printed out resignation letters, signed them, handed them to me and left the office.

12. In the short time since the Defendants' secret plans for mass defection came to light, HRBFA has learned from approximately 10 or more additional clients that – while the Defendants were still full time employees and agents of HRBFA, and still owing us a duty of loyal service -- the Defendants contacted and solicited these additional clients to follow them to SunTrust. Moreover, even though he was entrusted with the responsibilities and duties of an HRBFA Branch Manager, and was specifically receiving compensation for these duties, it now is clear that Mr. Majkowski was in the process of coordinating the defection of a team of producers representing more than 60% of the 2005 revenues of the office he managed. It also is clear that his plan was to spring this mass defection on HRBFA on Friday, January 13 – the Friday of the

three-day President's Day weekend – so that the Defendants would be free to solicit HRBFA clients at will throughout the three day weekend before HRBFA could file any action with the Court seeking an injunction to stop them.

### Recruitment by Former HRBFA Regional Manager Now Working with SunTrust

13. I believe that the Defendants were recruited to join SunTrust by HRBFA's former regional manager, Michael DePirri, who resigned from HRBFA and joined SunTrust last Fall. In fact, it has been reported to me that just yesterday, Mr. DiPirri insinuated to another HRBFA manager that he planned to recruit many more HRBFA brokers in the near future. It was also reported that Mr. DiPirri told my colleague that he had set up a new branch office location for SunTrust in Tyson's Corner, at which he now is employing not only Mr. Shirley, Mr. Majkowski and Mr. Romero, but also Sarah Klawitter, a former HRBFA broker in our Rockville, Maryland office. Ms. Klawitter resigned without prior notice last week and immediately began contacting and soliciting HRBFA clients to follow her to SunTrust. We have filed a separate action against Ms. Klawitter in the federal court in Maryland.

### Solicitation of Clients by the Defendants

14. As a former regional manager of HRBFA, Mr. DePirri knows full well that HRBFA employees such as the Defendants have contractual obligations like those set forth in the Defendants' Agreements. Unfortunately, despite the fact that the Defendants and their new employer undoubtedly knew of the Defendants' contractual obligations to HRBFA and, in particular, the contractual prohibition on their soliciting and contacting HRBFA clients, she already has embarked on a campaign of soliciting HRBFA clients. As indicated above, approximately 10 HRBFA customers formerly serviced by the Defendants have already reported that they received telephone calls from one or other of the Defendants in the time leading up to

their resignations, and that the Defendants told them they would be leaving HRBFA on Friday, January 13, and encouraged the clients to follow them to SunTrust.

15. In addition, although the Defendants have not yet to my knowledge transferred their securities licenses over from HRBFA to SunTrust, and therefore should not be speaking to customers about securities matters, at least one customer has reported having received a telephone call on Wednesday, January 11 about their move to SunTrust. Given the Defendants' activities thus far, it appears clear that they had commenced a campaign to pirate away as many of our clients as possible in connection with their planned surprise, mass resignation on the Friday leading into the three-day President's Day weekend. Their campaign no doubt has been slowed somewhat by the fact that they were discovered before their planned departure date, but there can be no doubt that Defendants intend to continue on this campaign of soliciting our clients to follow them to SunTrust. In fact, because there is no apparent regulatory reason why the Defendants' licenses should not have transferred to SunTrust immediately, I suspect that this has been a conscious decision on the part of Defendants to try to "fly under the radar" until Friday afternoon, which was their planned surprise departure time. A license transfer is a publicly observable event that would indicate they had joined SunTrust. Defendants may well be attempting to conceal their location in the hopes that it would stall HRBFA's efforts to enforce their contractual obligations, affording them the benefit of sending a mass mailing and making follow-up telephone calls over the President's Day weekend. This is why we are urging the Court to grant injunctive relief as soon as possible – so that the Defendants will not be able to engage in mass solicitation over the holiday weekend, and as a result cause incalculable harm to HRBFA, and to our Washington, D.C. office in particular.

16. I also believe that, in further violation of their Agreements and in violation of HRBFA's trade secret rights, the Defendants have improperly used confidential information pertaining to some or all of the HRBFA customers they formerly serviced or learned about while working with HRBFA. I believe this because there can be very little doubt that the Defendants have used client contact data to make their solicitation phone calls to clients. HRBFA client information, of course, is to be used only for the purposes of doing business of HRBFA. I am not able to know at this time what specific types and amounts of confidential client information the Defendants may have removed or wrongfully retained upon their resignation from HRBFA, but it is essential that the Defendants be ordered to return any such client information that they may have in their possession at this time.

### Confidentiality of HRBFA's Client Information

17. HRBFA's District of Columbia office has taken strict steps to maintain the confidentiality of HRBFA's customer lists and customer records and to ensure that the information contained in these records is not disclosed outside of HRBFA. The Defendants were fully aware of and responsible for complying with HRBFA's policy of confidentiality. Indeed, Mr. Majkowski was our Branch Manager for the Washington office. In addition, each of the Defendants signed the Agreements in which they expressly agreed to maintain the confidentiality of HRBFA's customer records, not to disclose this information outside of the company, and to return any such information immediately upon termination. (Exhibit "A" to Complaint ¶ 6; Ex. "B" to Complaint at ¶ 7; Ex. "C" to Complaint at ¶ 3).

18. Additionally, HRBFA has implemented other procedures to maintain the confidentiality of HRBFA's proprietary client list and the confidential and sensitive information entrusted to HRBFA by our clients. HRBFA policy is that a financial advisor is provided with

access only to confidential information pertaining to the particular clients serviced by his or her office. In addition, each financial advisor uses a confidential password to gain access to information pertaining to the HRBFA clients serviced by the District of Columbia office. In addition, HRBFA management personally reviews all outgoing correspondence from all of the employees in the office, giving us an opportunity to ensure, among other things, that no confidential or proprietary information is disclosed outside of HRBFA.

### HRBFA's Goodwill and Relationship with HRBFA Clients

19.  The HRBFA customers serviced by the Defendants were developed at great expense to HRBFA and over a number of years. HRBFA's customer list is the lifeblood of its business and the expenditures incurred by HRBFA in obtaining its clients include the millions of dollars spent by HRBFA and its corporate affiliates every year on advertising to build the HRBFA name recognition and reputation, the millions of dollars HRBFA spends for sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, telephone, mail, research, literature, seminars, and the many other expenditures HRBFA incurs in building and maintaining its goodwill in the securities industry and in compiling a customer list from which generations and many, many layers of new customers and accounts can be generated for years and years to come.

20.  The HRBFA customers serviced by the Defendants were the direct and indirect result of all of the vast expenditures incurred by HRBFA listed above, including, without limitation, advertising, equipment, registration, staff, asset managers, research and development, and seminars.

## Threat of Harm to HRBFA

21. The Defendants' conduct, as described above -- and specifically their solicitation of HRBFA clients and improper use of confidential HRBFA customer information -- constitutes a breach of contract, misappropriation of HRBFA's trade secrets, and a breach of their duty of loyalty to HRBFA.

22. Unless Defendants' wrongful conduct is immediately enjoined, other competitors of HRBFA may be encouraged to engage in the same illegal activity. In addition, Mr. DiPirri has made clear that he is in the midst of a campaign of recruiting HRBFA brokers. Although he knows full well that HRBFA financial advisors have contractual obligations not to solicit HRBFA clients on behalf of competitor firms, the pattern thus far – as reflected by Mr. Majkowski, Mr. Shirley, Mr. Romero and Ms. Klawitter – is that the employees he is recruiting are systematically ignoring their Agreements. If they are allowed to do so with impunity, and end up profiting from pirating away HRBFA accounts in violation of their Agreements, it will only encourage other HRBFA employees to respond to Mr. DiPirri's and SunTrust's overtures. The conduct of the Defendants' in trying to take away clients that last year comprised more than 60% of our Washington office revenues is highly destabilizing and disruptive of our office's ability to conduct business in a stable manner, to maintain HRBFA goodwill with its customers, and to enforce company policy applicable to our employees.

23. The Defendants' conduct has already begun to cause, and unless it is enjoined will continue to cause even greater amounts of irreparable harm to HRBFA as follows:

(a) Misuse of trade secret customer information which is solely the property of HRBFA and its clients;

(b) Loss of confidentiality of the information contained in clients' records, loss of confidentiality of clients' financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

(c) Loss of personnel, damage to office stability and encouragement of further similar or more egregious breaches; and

(d) Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

24. It is critical that the Defendants, and others working on their behalf, be prohibited from diverting HRBFA clients, and that they be required to return HRBFA's records and information immediately. Unless this conduct is immediately enjoined, HRBFA will continue to suffer incalculable damage, including the permanent loss of its customers and a loss of client confidentiality and goodwill.

I hereby declare under penalties of perjury and pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

_____
Michael Brezovec

Dated: January 12, 2006

-11-