## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

H&R BLOCK FINANCIAL ADVISORS, INC., )
             )
     **Plaintiff,**   )
             )
v.           )  **Case No. 1:06-CV-00057 (JR)**
             )  **Judge James Robertson**
J. DEREK MAJKOWSKI,   )
GEORGE SHIRLEY, and JUSTIN ROMERO, )
             )
     **Defendants.**  )

## OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

**I.**  **Introduction**

   H&R Block Financial Advisors, Inc. has rushed into this Court to enforce agreements

with J. Derek Majkowski, George Shirley, and Justin Romero. Although it is not unusual for this

Court to enforce post-employment restrictions, what is unusual – in fact, unprecedented – is the

nature and scope of the restrictions that H&R Block wants these former employees to be locked

into. Within the plethora of case law cited by H&R Block in its effort to suggest that this case is

simply a run of the mill "departing broker" situation in which injunctive relief should be issued

as a matter of routine, not a single case endorses the enforcement of the scope of restriction

confronted by this Court here. Moreover, given regulatory changes within the securities industry

in recent years, as well as under the applicable law, the contractual provisions H&R Block relies

upon are unenforceable. Although our law does permit, in some circumstances, the "blue

penciling" of a restriction to bring it in line with a former employer's legitimate business

interests, wholesale rewriting and replacement has never been permitted. Nor is H&R Block

able to show the other elements, such as irreparable harm, that are absolute prerequisites to the

injunctive relief that it seeks.

## II.    The Contractual Provisions At Issue

Each of the three former employees signed different agreements with H&R Block at different times.  The following is a summary of what each of those agreements provides, in relevant part:

| Former Employee | Restricted Activity | Term | Geographic Area |
|---|---|---|---|
| Mr. Majkowski | • "perform brokerage services for or accept brokerage business from . . .any customers having accounts with Company, with whom Employee had any contact whatsoever during the term of Employee's employment with Company" **(Section 8)** | 3 Years | No limit |
| | • "contact or solicit any of said customers" **(Section 8-A)** | 3 Years | No limit |
| | • "notify any of said customers of the said termination of Employee's employment" **(Section 8-B)** | No limit | No limit |
| | • "notify any of said customers where Employee is employed" **(Section 8-C)** | 3 years | No limit |
| | • "In the event said customers should request that employee serve said customers . . .Employee shall refuse to do so" **(Section 8-C)** | 3 years | No limit |

| Former Employee | Restricted Activity | Term | Geographic Area |
|---|---|---|---|
| Mr. Shirley | • "call upon, solicit, sell (either take a buy or sell order from) or attempt to sell any products or services similar to or in competition with those offered by the Company to any person or firm that was a customer of the Company at any time during my employment with the Company, or that was solicited by the Company or otherwise had any contact with the Company during the six month period preceding my termination of employment with the Company" **(Section 4-a)** | 2 years | No limit |
| Mr. Romero | • "contact or solicit any of said customers" **(Section 9-A)** | 1 year | No limit |
| | • "notify any of said customers of the termination of Employee's employment" **(Section 9-B)** | No limit | No limit |
| | • "notify any of said customers where Employee is employed" **(Section 9-C)** | 1 year | No limit |
| | • "In the event said customers should request that Employee serve said customers . . .Employee shall refuse to do so" **(Section 9-C)** | 1 year | No limit |

In asking the Court to enforce these provisions, H&R Block clearly wants to force departing stockbrokers to "disappear off the face of the earth," so that clients have no idea that

the broker has left, no way to contact the broker, and no way to meaningfully exercise the free choice of financial advisors that the securities industry rules require. Meanwhile, H&R Block wants the exclusive and unlimited right to carry out a high pressure sales effort to convince the clients not to move, even employing inaccurate statements to disparage the former employees in their effort to convince the clients that they would be better off not transferring their accounts.

The relief sought is not warranted under the applicable law or the relevant facts. This Court should deny H&R Block's request for injunctive relief, vacate the Order entered on January 13, 2006, and direct the parties to proceed to the arbitration matter that H&R Block has already filed.

## III.    Underlying Facts

H&R Block is a securities firm employing licensed stockbrokers and other employees to provide investment services to clients. Mr. Majkowski, Mr. Shirley, and Mr. Romero are former H&R Block employees who resigned on January 9, 2006 and began work for SunTrust Investment Services, Inc., a competing securities industry firm. (Although H&R Block pins the date of the resignation as January 10, 2006, that is not correct.)

H&R Block goes to great lengths to try and paint this case as one involving a clandestine and premeditated "sneak attack" on its business. This is not the case. The former employees, all of whom worked together as a "team" with contractual and fiduciary obligations to each other and to their partnership, exercised their lawful right to leave H&R Block and pursue alternative employment. *See* Declaration of J. Derek Majkowski, attached hereto and made a part hereof as Exhibit "A," ¶¶ 2-5; Declaration of George Shirley, attached hereto and made a part hereof as Exhibit "B," ¶¶ 2-11; Declaration of Justin Romero, attached hereto and made a part hereof as Exhibit "C," ¶¶ 2-5. In doing so, they made informational contacts with clients to let clients

4

know where they can be located. *See* Majkowski Decl., Exhibit "A," ¶¶ 20-22, 27-29, 33-36; Shirley Decl., Exhibit "B," ¶¶ 18-20, 25-27, 31-33; Romero Decl., Exhibit "C," ¶¶ 16-19. They did so not as a solicitation, but to fulfill their own fiduciary and other duties, to let clients know where they can be located should it be necessary to do so, and to allow the clients to exercise their undeniable right to choose where their financial accounts will be serviced. *See* Majkowski Decl., Exhibit "A," ¶¶ 20-22, 27, 34; Shirley Decl., Exhibit "B," ¶¶ 18-20, 25, 31; Romero Decl., Exhibit "C," ¶¶ 16-19, 28-30. A copy of the letter that they sent to certain clients is attached hereto and made a part hereof as Exhibit "E."

The only "evidence" H&R Block offers of any solicitation is inadmissible double hearsay, in the form of Michael Brezovec's Declaration. *See* Brezovec Decl., ¶ 10. Mr. Brezovec says that another H&R Block employee told him that a client told that person that Mr. Romero "asked the client to transfer his account." *See id.* The client is not identified, and neither that client, nor any other client, has signed a Declaration. Not even the other H&R Block employee, Christopher Warren, who is clearly within H&R Block's control, has provided any competent testimony. Mr. Romero has, in any event, refuted this allegation. *See* Romero Decl., Exhibit "C," ¶ 17. Mr. Romero is an experienced securities industry employee who has changed jobs before, and was careful not to solicit any clients. *See id.,* ¶¶ 16-17.

H&R Block clearly did learn that the former employees were planning to resign on Friday, January 13, 2006. The former employees then decided to resign a few days earlier than they had planned. *See* Majkowski Decl., Exhibit "A," ¶ 23; Shirley Decl., Exhibit "B," ¶ 21; Romero Decl., Exhibit "C," ¶ 20.

It is not typical in the securities industry for brokers to give advance notice of a planned departure. *See* Majkowski Decl., Exhibit "A," ¶ 43; Shirley Decl., Exhibit "B," ¶ 35; Romero

Decl., Exhibit "C," ¶ 32.  At H&R Block, as in most other firms, giving such notice is

tantamount to being asked to be terminated, and results in severe consequences.  *See* Declaration

of Michael Depirri, attached hereto and made a part hereof as Exhibit "D," ¶ 23.  Brokers

wishing to avoid the stigma of being "fired" clearly must not give advance notice of their plans

to leave.  *See id.*  (In this case, H&R Block is nevertheless telling clients that the former

employees were "fired," using that inaccuracy as a tool to try and keep the clients' accounts.)

In leaving H&R Block, the former employees did nothing to disable H&R Block's

legitimate business interest in competing for the clients serviced by the former employees.  No

records were destroyed, disabled, or hidden, and H&R Block has been fully capable of

marshaling the resources to identify and contact all of the clients involved – and even to solicit

their business as actively as possible.  *See* Majkowski Decl., Exhibit "A," ¶¶ 24-26, 44; Shirley

Decl., Exhibit "B," ¶¶ 22-24, 36; Romero Decl., Exhibit "C," ¶¶ 21-23, 33.  Regrettably, H&R

Block has abused its position by telling clients and others that the former employees were

"fired."  *See* Majkowski Decl., Exhibit "A," ¶ 29; Shirley Decl., Exhibit "B," ¶ 27; Romero

Decl., Exhibit "C," ¶ 24.

The former employees did make copies of certain records.  *See* Majkowski Decl., Exhibit

"A," ¶ 24; Shirley Decl., Exhibit "B," ¶ 22; Romero Decl., Exhibit "C," ¶ 21.  They did so in the

interests of the clients involved.  *See* Majkowski Decl., Exhibit "A," ¶ 24; Shirley Decl., Exhibit

"B," ¶ 22; Romero Decl., Exhibit "C," ¶ 21.  Those records have been sent to the former

employees' counsel, and no copies or other information derived from those records has been

retained.  *See* Majkowski Decl., Exhibit "A," ¶ 24; Shirley Decl., Exhibit "B," ¶ 22; Romero

Decl., Exhibit "C," ¶ 21.  Counsel will make arrangements to deliver those records to H&R

Block, through its counsel. (They were mailed to counsel late Friday, January 13, 2006, but have not yet arrived.)

In no instance have any of the former employees been motivated by an intent to injure H&R Block, to violate any legitimate business interests of H&R Block, or to otherwise act unlawfully. *See* Majkowski Decl., Exhibit "A," ¶¶ 5-15; Shirley Decl., Exhibit "B," ¶¶ 5-11; Romero Decl., Exhibit "C," ¶¶ 10-14. On the contrary, their motivation has been in the interest of their clients, their families, and their careers. *See* Majkowski Decl., Exhibit "A," ¶¶ 5-15; Shirley Decl., Exhibit "B," ¶¶ 5-11; Romero Decl., Exhibit "C," ¶¶ 10-14. Each were loyal employees of H&R Block for years, and each struggled to make things work out at H&R Block before deciding to change jobs. *See* Majkowski Decl., Exhibit "A," ¶ 14; Shirley Decl., Exhibit "B," ¶¶ 5-11; Romero Decl., Exhibit "C," ¶¶ 10-14.

The overriding concern of the former employees has been for the interests of the clients involved. *See* Majkowski Decl., Exhibit "A," ¶ 27; Shirley Decl., Exhibit "B," ¶ 20; Romero Decl., Exhibit "C," ¶¶ 28-30. Those client interests make it essential that the former employees be permitted to communicate with clients, without being hindered by any sort of injunction. *See* Majkowski Decl., Exhibit "A," ¶¶ 34-36; Shirley Decl., Exhibit "B," ¶¶ 31-33; Romero Decl., Exhibit "C," ¶¶ 28-30.

On another issue that is the subject of great speculation by H&R Block, its alleged suspicions must be put to rest. H&R Block claims, also without proof, that another former employee, Michael Depirri, recruited the former employees to SunTrust (where Mr. Depirri has been working since October 3, 2006). *See* Brezovec Decl., ¶ 13. This suspicion is false. None of the former employees were recruited by Mr. Depirri. *See* Majkowski Decl., Exhibit "A," ¶¶ 8-

9; Shirley Decl., Exhibit "B," ¶ 13; Romero Decl., Exhibit "C," ¶ 7; Depirri Decl., Exhibit "D," ¶¶ 5-11.

Finally, it bears mention that although H&R Block complains vociferously about the conduct of the former employees in this case, it fails to mention that its own active recruiting efforts involve seeking and hiring experienced financial advisors to bring books of business to H&R Block, financial incentives to make them do so, and obtaining client information before any resignation. *See* Majkowski Decl., Exhibit "A," ¶¶ 37-43; Depirri Decl., Exhibit "D," ¶¶ 12-22. Recruits are counseled *not* to give advance notice, and to resign, if possible, before a long weekend or holiday. *See* Majkowski Decl., Exhibit "A," ¶ 40; Depirri Decl., Exhibit "D," ¶ 18. Active solicitation, not mere informational contacts, are encouraged. *See* Majkowski Decl., Exhibit "A," ¶¶ 37, 39, 42; Depirri Decl., Exhibit "D," ¶¶ 12-13, 19, 21-22.

In fact, Mr. Majkowski himself was directed to oversee such efforts while he worked at H&R Block. *See* Majkowski Decl., Exhibit "A," ¶¶ 37-43. He was specifically commended and praised for following H&R Block's policies in carrying out hires. *See id.,* ¶ 40.

## ARGUMENT

**IV.    The Legal Standards Governing This Motion**

Requests for injunctive relief in the federal courts are governed by Fed. R. Civ. P. 65. Motions brought under Rule 65 are assessed by a well-known test applying four factors: (1) the likelihood of irreparable harm to the movant if the injunctive relief is denied; (2) the likelihood of harm to the defendants if the injunctive relief is granted; (3) the likelihood that the movant will succeed on the merits; and (4) the public interest. *See CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995); *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C. Cir. 1998).

## V.    Modern Securities Industry Rules

It was a much different era in the securities industry when Mr. Majkowski was forced in 1994 to sign the contract of adhesion that H&R Block now seeks to enforce against him. Similarly, when most of the cases cited by H&R Block were decided, there were no rules to prohibit a firm from forcing employees to sign, and then going to court to enforce, documents mandating essentially a "Covenant to Disappear."

Today, the rules have changed significantly. Now, NASD Rule 11870 makes it clear that clients are free to work with the financial advisors of their choice, and that requests for account transfers must be honored. A copy of Rule 11870 is attached hereto and made a part hereof as Exhibit "E." Effective February 11, 2002, the NASD also adopted Interpretive Material 2110-7, which gives further guidance with respect to departing broker disputes such as this. A copy of Interpretive Material 2110-7 is attached hereto and made a part hereof as Exhibit "F."

Interpretive Material 2110-7 provides, in pertinent part, as follows:

> As a condition of employment, certain members require their registered representatives to sign employment contracts in which each registered representative agrees that when he or she leaves the firm, he or she will not take, copy, or share with others any firm records. In addition, the registered representative may agree that, for a certain period of time following his or her departure from the firm, he or she will not solicit the firm's customers for business. Nonetheless, when a registered representative leaves his or her firm for a position at a different firm, clients serviced by the registered representative may decide to continue their relationship with the registered representative by transferring their accounts to the registered representative's new firm. The registered representative's former firm, concerned that its former employee may have breached his or her employment contract by sharing client information with the new firm, or soliciting clients to transfer their accounts to the new firm, sometimes seeks a court order to prevent the transfer of accounts.

> *            *            *

> In *NASD Notice to Members 79-7* (February 13, 1979), the NASD alerted its members that the SEC had issued a notice to broker/dealers stating that unnecessary delays in transferring customer accounts, including delays

accompanied by attempts to persuade customers not to transfer their accounts, are inconsistent with just and equitable principles of trade. NASD Regulation believes that obtaining court orders to prevent customers from following a registered representative to a different firm is similar to the unfair practice of delaying transfers that the SEC warned of in its notice.

To address this concern, NASD Regulation has adopted Interpretive Material 2110-7, which provides that it is inconsistent with just and equitable principles of trade for a member or person associated with a member to interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative, provided that the account is not subject to any lien for monies owed by the customer or other bona fide claim. Prohibited interference includes, but is not limited to, seeking a judicial order or decree that would bar or restrict the submission, delivery, or acceptance of a written request from a customer to transfer his or her account.

*See* Exhibit "F" hereto (emphasis supplied).

Obviously, the NASD recognizes and promotes the need for full disclosure to clients of the departure of brokers as well as their new employer and contact information, so that the clients can exercise their right to decide where, and by whom, their accounts will be serviced. In this same vein, names and addresses of clients are simply not given the status as trade secrets that H&R Block claims. *See Merrill Lynch, Pierce, Fenner & Smith v. E.F. Hutton & Co.,* 403 F. Supp. 336, 341(E.D. Mich. 1976). (it is the "usual practice for account executives to retain photocopies of records when they change employers"). As evidence that client names and addresses are not viewed as sacrosanct in the securities industry, several firms have entered into a written Protocol that specifically authorizes a departing broker to take names, addresses, and other information to the new firm. *See* "Three Firms Adopt Rules to Handle Broker Defections," *The Wall Street Journal,* August 10, 2004, a copy of which is attached hereto and made a part hereof as Exhibit "H." Nor is a former employee required to "forget" the information in his or her memory when she resigns. *Restatement (Second) of Agency* § 396 cmt. b ("Comment on

Clause (b)") (1958) (providing that an agent is "normally privileged to use, in competition with the principal, the names of customers retained in his memory").

The restrictions that H&R Block seeks in this case are designed to thwart those rights and interests and to ensure that H&R Block will be able to impose its own will upon the clients. Such a result cannot be consistent with the public interest. It also bears mention that almost all of the cases cited by H&R Block in its papers predate Interpretive Material 2110-7 and the NASD's crackdown on efforts to put departing brokers out of business.

## VI.    H&R Block Fails To Offer Sufficient Evidence To Obtain Injunctive Relief

H&R Block has not provided any competent, admissible evidence of wrongful conduct on the part of the former employees. The Complaint was not verified. The only form of evidence offered was Mr. Brezovec's Declaration and Supplemental Declaration. Mr. Brezovec attempts testimony in only a few areas that might support of the request for injunctive relief. *See* Brezovec Decl., ¶¶ 10 (double hearsay as to alleged statements of Mr. Romero, filtered through the alleged out of court statements of at least two other people), 11 (hearsay as to alleged statements and conduct of Mr. Majkowski, as allegedly heard and observed by others and allegedly communicated to Mr. Brezovec), 12 (conclusory statements as to apparent hearsay as to alleged statements of unidentified "additional clients" as heard by unidentified persons and allegedly communicated to Mr. Brezovec), 13 (speculation as to the involvement of others in the events in this case), 14 (speculation as to the knowledge of others, and further hearsay), 15 (speculation as to the knowledge and intent of others, and further hearsay from unidentified sources), 16 (speculation as to what others have done), 23 (conclusory statements, without any factual explanation, as to alleged harm to H&R Block). In other areas, his testimony is in the form of generalized legal conclusions, not facts shown to be within his personal knowledge;

Brezovec Supp. Decl., ¶ 5 (speculation about the alleged missing contents of a file). *See, e.g.,* Brezovec Decl., ¶¶ 4 (purporting to state generally Mr. Majkowski's legal duties).

The former employees object to the Brezovec Declarations. In addition to the fact that the Declarations are replete with inadmissible information, it is also clear that Mr. Brezovec will exaggerate and distort any information he believes he possesses. For example, in Paragraph 13 of his Declaration, he concludes – admittedly based on speculation, without any proper basis – that Mr. Depirri is recruiting H&R Block employees. *See* Brezovec Decl., ¶ 13. Later on in his Declaration, however, that speculation is enlarged to a firm conviction that "Mr. Depirri has made clear that he is in the midst of a campaign of recruiting HRBFA brokers." *See id.,* ¶ 22. There are no facts to support that statement, none exist, and it is untrue.

Mr. Brezovec's testimony requires, in any event, a proper evidentiary foundation. *See* Fed. R. Evid. 802. Fed. R. Evid. 602 dictates that: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *See also* Fed. R. Evid. 805 (requiring that each instance of hearsay meet one of the exceptions to the hearsay rule in order to be admissible).

A competitor's alleged suspicions concerning another party's conduct do not justify the extreme remedy of injunctive relief. *See United States v. 69.1 Acres of Land,* 942 F.2d 290, 292 (4th Cir. 1991) ("to allow mere speculation and conjecture to become a guide . . . is to be condemned in business transactions as well as in judicial ascertainment of truth"). Mere conclusory allegations that a party has done something wrong cannot be a proper basis for injunctive relief. These suspicions and baseless opinions are inadmissible hearsay, speculation, and conjecture.

These assertions prove nothing. Injunctive relief is an extraordinary remedy, not to be granted lightly and not to be awarded based on inadequate evidence of wrongdoing suitable to be enjoined. Notably, H&R Block does not show competent evidence of the loss of a single customer, or a single tangible impact, as a result of any unlawful action by the former employees. There is no presumption of such harm, and the fact that Mr. Brezovec will simply sign a Declaration giving a laundry list of alleged damages, from "loss of goodwill" to "damage to office stability" is insufficient proof. *See* Fed. R. Evid. 701 (opinion testimony by lay witnesses is admissible only if rationally based on the perception of the witness *and* helpful to a clear understanding of the witness' testimony or the determination of a fact in issue).

## VII.    H&R Block Otherwise Fails To Meet The Standards For Obtaining Injunctive Relief

H&R Block fails completely to meet the standards for obtaining injunctive relief in this case. On each of the four elements, it provides no competent, admissible, sufficient proof.

### A.    Irreparable Harm

H&R Block has not demonstrated that it has suffered or is suffering from any irreparable harm. H&R Block's claims that it will be subjected to irreparable harm are conclusory and general, lacking specific proof. For example, H&R Block suggests that it will suffer "disclosure of trade secrets" and other materials as well as "loss of confidentiality of clients' records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation." H&R Block provides no evidence to support those dire predictions, and it does not explain how an employee's exercise of his or her legitimate right to change jobs has or will lead to such consequences.

Since the former employees resigned, H&R Block has been fully capable of protecting its legitimate business interests to compete for client accounts and to try to persuade clients not to

move their accounts.  H&R Block has not denied this.  If H&R Block can prove any actionable

conduct on the part of the former employees, it can and will be free to pursue those claims in the

pending arbitration that it has filed.  The damages will be quantifiable, measured by the lost

profit caused by the conduct in question.  Any alleged monetary losses can be pursued fully

before the NASD in the pending arbitration proceeding.  *See Int'l Ass'n of Machinists and*

*Aerospace Workers v. 2 Nat'l Mediation Bd.,* 374 F.Supp.2d. 135, 142 (D.D.C. 2005) (citations

omitted).

Thus, since H&R Block's damages are capable of being ascertained and compensated by

monetary relief, H&R Block, as a matter of law, is not without an adequate remedy at law.  It is

well recognized within the securities industry that in cases such as this, an adequate legal remedy

is available.  *See Merrill Lynch, Pierce, Fenner & Smith, supra,* 403 F. Supp. at 344.  H&R

Block does not, and could not, argue that there is some reason why the relief it will ultimately

seek before the NASD will be "futile" in the absence of injunctive relief.  *See Nat'l Ass'n of*

*Farm Workers Orgs. v. Marshal,* 628 F. 2d 604, 613, (D.C. Cir. 1980).

B.    The Relative Burden and Benefit of Injunctive Relief

H&R Block has also failed to show that the benefit of an injunction outweighs the burden

to the former employees as the result of an injunction.  In fact, the benefit of any injunction

would not outweigh the burden upon the former employees.  The former employees have shown

that they have professional, fiduciary, and other legal obligations to clients to stay in contact with

them and to be available, if necessary.  *See* Majkowski Decl., Exhibit "A," ¶¶ 27, 34-36; Shirley

Decl., Exhibit "B," ¶¶ 25, 32-33; Romero Decl., Exhibit "C," ¶¶ 28-30.  The risk to them that

they will be subject to liability for damages to those clients and possibly even face ramifications

with respect to their license is obviously very significant.  *See* Majkowski Decl., Exhibit "A," ¶¶

14

27, 34-36; Shirley Decl., Exhibit "B," ¶¶ 25, 32-33; Romero Decl., Exhibit "C," ¶¶ 28-30. Preventing them from client contact also allows H&R Block to hide their whereabouts and to continue their campaign to misstate the circumstances under which they left H&R Block. *See* Majkowski Decl., Exhibit "A," ¶ 29; Shirley Decl., Exhibit "B," ¶¶ 27, 31-33; Romero Decl., Exhibit "C," ¶ 24. Preventing the former employees from contacting clients to refute such assertions poses a great threat to their livelihood and reputation.

On the other hand, the relative harm to H&R Block from the of injunctive relief is slight. H&R Block will remain fully capable of competing for clients and even soliciting them to stay with H&R Block. The practice espoused by the securities industry, that a client's freedom of choice be maintained, will not be hindered. The balance of the harm favors the denial of the injunctive relief H&R Block seeks.

C.      The Public Interest

Third, there is no public interest in favor of the relief sought. On the contrary, the public interest is in allowing free communication between brokers and customers. The relationship is such that the communication should not be restricted as H&R Block urges. In *Prudential Securities, Inc. v. Plunkett,* 8 F. Supp. 2d 514, 520 (E.D. Va. 1998), the United States District Court for the Eastern District of Virginia held as follows:

> If the Court interpreted "solicitation" as proscribing communication between Plunkett and his former Prudential clients, the clients might be prejudiced. A broker-client relationship, like a lawyer-client or a doctor-patient relationship, is a personal relationship dependent on personal trust. <u>Clients should be free to deal with the broker of their choosing and not subjected to the turnover of their accounts to brokers associated with the firm but unfamiliar to the client, unless the client gives informed consent to the turnover.</u>

See *id.* (emphasis added). *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Liniere,* 572 F. Supp. 246, 249 (N.D. Ga. 1983) (concluding that the public interest weighs in favor of

allowing the relationship between the customer and his broker to continue when the broker changes firms). The public interest is also in favor of permitting the "competition that is a necessary and desirable incident of free enterprise." *Restatement (Second) of Torts*, § 768 cmt. E (1979) ("Comment on Clause (b)").

D.    Likelihood of Success on the Merits

Finally, H&R Block cannot show the required substantial likelihood of success on the merits of its underlying claims. Now that any issue of information copied at H&R Block has been ameliorated, H&R Block's sole basis for pursuing injunctive relief is contractual. As illustrated above, *see* Section II, *supra*, the agreements H&R Block brings suit on are cast in the broadest possible terms. H&R Block can cite to no case in which such sweeping restrictions were upheld.

This Court, for example, in *Morgan Stanley DW, Inc. v. Rothe,* 150 F.Supp.2d. 67 (D.D.C. 2001), was faced with a far less restrictive agreement than the ones involved in this case. There, this Court found it significant that the agreement did not purport to wipe out all communication with clients or competition with the former employer. This Court noted in that regard that, ". . . the agreement does not permit the defendant's former Morgan Stanley clients who wish to continue working with the defendant from *contacting him*, and choosing to move their accounts to Oppenheimer." *See id.,* 150 F.Supp.2d. at 74 (italics in original). The former employer in that case even aided clients who wanted to contact the former employee: "Indeed, Morgan Stanley is forwarding the defendant's incoming calls to his new number at Oppenheimer." *See id.,* 150 F.Supp.2d. at 75. (This Court in that case was also swayed by the complete removal of information from the former firm, a factor not present here. *See id.,* 150 F.Supp.2d. at 71, 75, 77.)

And the agreement in that case did not contain any prohibition upon competition for other clients: "Moreover, the Agreement does not prevent the defendant from working for his new employer and from competing with Morgan Stanley for the patronage of the public at large." *See id.* In contrast, the agreements in this case do call for a prohibition on competition, both generally and with respect to specific categories of clients. The clients swept into the restrictions include not only clients serviced by the former employees, but even clients who were "solicited by the Company or otherwise had any contact with the Company." The agreements signed by Mr. Majkowski and Mr. Romero purport to state that they may not even tell clients that they are not working for H&R Block any longer.

Recognizing these deficiencies, H&R Block crafts requested relief that does not mirror the contractual provisions involved. This is not an exercise in "blue penciling" an overly broad post-employment restriction. It is instead a wholesale rewriting and replacement of the contractual language, coupled with a request that the Court ignore the contract provisions that prohibit basic contact with clients.

H&R Block thus retreats to a position that it should be entitled to enjoin "contacting, soliciting or calling upon, any person or entity that was a customer of HRBFA, whom Defendants serviced or whose name became known to Defendants, while employed with HRBFA." That language is not in the agreements it has filed suit upon; rather, it has been crafted out of whole cloth by H&R Block. Firms wishing to set forth specific, enforceable post-employment restrictions can clearly do so. *Cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F. Supp. 2d 27, 31 (D.D.C. 2002) (agreement enforced had specific definition of the term "solicitation," which the agreement prohibited). H&R Block did not do so. It is not for this

Court to replace the unenforceable language in the contracts with something H&R Block has drafted in an effort to show what *might have been* reasonable, had the parties agreed to it.

If H&R Block had wanted to change the agreements, it had every opportunity to do so. It could have sought to amend the agreements while the former employees worked there, in view of the recent changes in the securities industry rules and regulations. *See* Section V, *supra.* It did not do this. It has not even asked for judicial modification of the agreements, such as under a theory of equitable reformation or some other permissible basis.

A similar issue is posed by the fact that the former employees were working together as part of a "team." This association carries with it legal duties and other implications. *Cf.* D.C. Code §§ 33-101.01(7) and 33-102.02 (dictating that such an association is a "partnership," whether or not the parties intended it to be so); D.C. Code § 104.04 (partners owe duty of loyalty and duty of care to each other). *See also Day v. Sidley & Austin,* 394 F. Supp. 986, 991 (D.D.C. 1975) (partners owe common law duty of loyalty, good faith, and fair dealing to the other partners of a partnership).

Had H&R Block wanted to address the former employees' "team" relationship – which was clearly not a secret to H&R Block – it could have done so; yet it did not, and it wants to invent language after the former employees have left to deal with what it wishes it had put in place.

The leading District of Columbia Court of Appeals case on the enforceability of post-employment restrictions holds that a former employer may not enforce the restraint at issue if it is greater than necessary to protect a legitimate business interest. *See Ellis v. James V. Hurson Assocs.,* 565 A.2d 615, 618 (D.C. 1989). It references "blue penciling," and describes it as excising or severing an overly broad provision of the contract. *See id.,* 565 A.2d at 616-618.

Nowhere does it endorse rewriting a contract, as opposed to deleting an offensive portion. *See id.* Moreover, the Court of Appeals held that even "blue penciling" may be unavailable where, as here, the employer has seriously overreached its legitimate interests. *See id.*

H&R Block fares no better if Michigan law were to be applied to the contracts signed by Mr. Shirley and Mr. Romero. The Michigan statutory scheme is very specific as to the standards for a valid post-employment restriction. MCL 445.774a states as follows:

> (1) An employer may obtain from an employee an agreement or covenant which protects an employer's *reasonable competitive business interests* and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

*See id.* (emphasis added). In this case, even if Michigan law were to be applied, there is no way to modify the agreement other than to create, out of whole cloth, entirely new provisions such as the ones H&R Block asks the Court to enforce. H&R Block provides no authority supporting that Michigan law, any more than District of Columbia law, would allow complete rewriting of the contract as contrasted with modification of overly broad terms.

Clearly, what H&R Block desires is a blanket prohibition upon any client contact with Ms. Klawitter. They would like a resignation to prompt a broker to "disappear from the face of the earth," at least as far as the clients are concerned. There is no legal authority providing for a complete prohibition upon customer contact. In fact, customers have a very real need to remain in contact with their financial advisors, especially during tax season. H&R Block offers no authority to the contrary. Indeed, the NASD rules prohibit H&R Block from interfering with the customers' ultimate choice of where they wish to take their business. *See* NASD Rule 11870,

19

Exhibit "D" hereto (requiring that customers' choice concerning transfer of accounts be honored). As a matter of law, informing customers of a change of employment is not a solicitation. *See, e.g., Wells v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 919 F. Supp. 1047, 1053 (E.D. Ky. 1994) (holding that "[a] mere informational contact between [the broker] and any former client does not constitute a 'solicitation'").

Even if the facts in the case of *Merrill Lynch v. Bradley,* 756 F.2d 1048 (4th Cir. 1985), which H&R Block cites at length, were applicable here – which they are not – a great deal has changed since that decision was issued. NASD Rule 11870 has been adopted, evincing the NASD's clear mandate that the interests of customers come first in these kinds of situations. *See also* NASD Interpretive Material 2110-7, Exhibit "E" hereto. Rule 11870 states that customer preferences must control where those customers decide to keep their accounts. One wonders how Rule 11870 could have any meaning if brokers were not allowed to tell clients where they can be located. As much as H&R Block would like to ignore these requirements, the law does not support that effort. H&R Block does not have a substantial likelihood of success on the merits of its efforts to restrain normal and lawful competition.

## VIII.    H&R Block Is Barred From Obtaining The Relief It Requests By Its Own Unclean Hands

H&R Block's own standard business practices involve aggressive recruiting of experience brokers from other firms, and conduct far worse than H&R Block claims here. *See* Majkowski Decl., Exhibit "A," ¶¶ 37-43; Shirley Decl., Exhibit "B," ¶ 34; Romero Decl., Exhibit "C," ¶ 31; Depirri Decl., Exhibit "D," ¶¶ 12-22. H&R Block itself directed Mr. Majkowski in recruiting efforts that included preparing to solicit clients, gathering client information to prepare letters in advance of the resignation, solicitation of clients, resignation

without advance notice and before a weekend, and H&R Block then commended and praised Mr. Majkowski's efforts. *See* Majkowski Decl., Exhibit "A," ¶¶ 37-43.

Under the circumstances, there is an immediate and necessary relation between H&R Block's conduct and the parties and facts at bar. *See Morgan Stanley DW, Inc. v. Rothe, supra,* 150 F.Supp.2d. at 80. H&R Block therefore comes to this Court with unclean hands. Its requests for equitable relief should also be denied on that independent basis. Under similar circumstances, courts have recognized the impropriety of a firm rushing into court to try and enjoin conduct that is part of its own standard operating procedure. *See Morgan Stanley DW, Inc. v. Frisby,* 161 F. Supp.2d, 1371, 1380 (N.D. Ga. 2001). In *Frisby,* the court stated:

> Morgan Stanley is estopped by its unclean hands from seeking equitable relief from this Court. Equity does not permit Morgan Stanley to enforce restrictive covenants against Defendants . . . when it actively recruits brokers from competitors and encourages them to retain and use copies of client records to solicit the transfer of client accounts from those competitors without regard to any agreements between the brokers and the competitor.

H&R Block's unclean hands and inequitable conduct should bar it from seeking equitable relief in this matter. Clearly, H&R Block itself hires brokers from other firms and actively encourages those brokers to do far more than the former employees have done in this case. It cannot seek to enjoin any of the former employees' conduct given its own business practices.

## IX.    Conclusion

This Court should exercise its discretion to deny H&R Block's requests for injunctive relief, to stay this matter pending the NASD arbitration, and to direct the parties to arbitrate their disputes in the pending NASD arbitration.

Respectfully submitted,


JACKSON AND CAMPBELL, P.C.

*/s/ Vernon W. Johnson, III*
_____

Vernon W. Johnson, III (#423756)
1120 Twentieth Street, N.W.
South Tower
Washington, D.C.  20036-3437
(202) 457-1600 – telephone
(202) 457-1678 – facsimile

Counsel for Defendants
J. Derek Majkowski, George Shirley,
and Justin Romero

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2006, a copy of the foregoing Opposition to Motion for Temporary Restraining Order and Preliminary Injunction, with appended Exhibits "A" through "H," and proposed from of Order, was filed electronically and served upon the following pursuant to LCvR 5.4(d):

Robert C. Gill, Esq.
SAUL EWING, LLP
1025 Thomas Jefferson Street, N.W.
Suite 425W
Washington, D.C. 20007

Counsel for Plaintiff

*/s/ Vernon W. Johnson, III*

_____

Vernon W. Johnson, III