# Exhibit "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| H&R BLOCK FINANCIAL ADVISORS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>J. DEREK MAJKOWSKI, )<br>GEORGE SHIRLEY, and JUSTIN ROMERO, )<br>)<br>Defendants. ) | Case No. 1:06-CV-00057 (JR)<br>Judge James Robertson |

## DECLARATION OF J. DEREK MAJKOWSKI

J. Derek Majkowski, being duly sworn, deposes and states as follows:

1. My name is J. Derek Majkowski. I am over the age of eighteen and competent to testify herein.

2. I am a Certified Financial Planner employed by SunTrust Investment Services, Inc. in its offices in Vienna, Virginia. I have been working there since January 9, 2006.

3. On January 9, 2006, I resigned from H&R Block Financial Advisors, Inc., where I had been working in H&R Block's District of Columbia offices, and began working at SunTrust in its Vienna, Virginia office.

4. There were no contractual or other restrictions upon my ability to resign from H&R Block and accept a position elsewhere. For example, I was not required to give H&R Block any advance notice of my resignation.

5. The main reason I resigned from H&R Block was that SunTrust was a better opportunity for me personally and offers greater investment opportunities and services for brokerage clients. I found that SunTrust offered a superior platform for support for new client relationships. I thought it would help me both in marketing to new clients, obtaining more

opportunities for client referrals, and offering additional and superior products and services to clients. At the same time, SunTrust, to me, still had a "small pond" feel where you would not be just one out of thousands of advisors, but could get attention from corporate management.

6.     I started working for H&R Block in 1994 as a financial advisor, when the Company was called "OLDE Discount Corporation."

7.     While at H&R Block, my immediate supervisor was Michael Brezovec.

8.     I am also well acquainted with Michael Depirri, a SunTrust employee who used to work at H&R Block. Mr. Depirri and I are close friends. He was in my wedding. He did not, however, recruit me to come to SunTrust. He did not encourage me to leave H&R Block. He did not persuade me to consider SunTrust or take a job at SunTrust. I made the decision on my own to approach SunTrust about possible employment. Ultimately, I decided to join SunTrust because of the opportunities that were presented, and not because Mr. Depirri worked at SunTrust.

9.     There were a number of reasons why I was exploring other opportunities, not just at SunTrust but at other firms, as well.

10.    I was a "producing Branch Manager" at H&R Block. H&R Block was pushing me to make a choice to be either a financial advisor or a branch manager, but not both. I did not like this pressure, and I frankly did not think that the choice being presented offered good options for me. I was not happy with the direction of H&R Block and was unsure about my future prospects there.

11.    Were I to focus on being a branch manager, H&R Block was making it clear, from direct communications by management, that branch managers needed to focus on management issues, primarily recruiting experienced brokers to join H&R Block from other firms. Those hires

were expected to move their "books of business" to H&R Block, and to bring other brokers and books of business to H&R Block.

12. Although I had been able to recruit three experienced brokers to H&R Block in recent years, I felt that the long-term recruiting strategy was flawed. The company "brand" was associated with low-cost tax preparation and a presence at Sears Department Stores. It did not convey financial sophistication. The office locations were also not in prime "Class A" office locations. All of these things made it difficult to attract recruits.

13. Also, H&R Block wanted recruiting to be done by having branch managers "cold call" experienced brokers at other firms. This I found to be very time consuming and completely ineffective. In the industry, it is more typical to have headhunters make these kinds of calls.

14. I was also dissatisfied with the direction that H&R Block was going. It seemed that our parent company, the brokerage affiliate, and the tax service were all moving in different directions. There had been significant, and tumultuous, reorganizations on the managerial side of the brokerage affiliate. I told my concerns to Chris Zelesnick (H&R Block's Divisional Director). I told him how difficult it was to recruit at H&R Block. I was personally very frustrated at where I saw the company heading. In the early summer of 2005, I told Mr. Zelesnick and Mr. Brezovec of my concerns and challenges with recruiting at a dinner – the discussion included specifically the challenges with the brand of H&R Block and the lack of support and direction for the brokerage affiliate. This was directed specifically to Mr. Brezovec and his failure to effectively do his job, which was to assist me and the branch with the recruiting process – which he clearly could not do and did not do. There was virtually no support for my efforts and I was curtly told by Mr. Zelesnick that I "was making excuses and clearly did not care about the branch." I was personally frustrated and visibly upset by Mr. Zelesnick's comments about my lack of care or

concern for something I not only worked very hard to overcome but also as someone who managed to show some of the only signs of success in recruiting over recent years in Mr. Brezovec's area. It also came as a verbal slap in the face to someone who had been so loyal and committed to this organization's cause for over 10 years.

15. Were I to try and focus on being just a financial advisor, I did not like those opportunities, either. There were no significant referral opportunities so that I could grow my business. I did not feel that the complete range of products and services were available to clients.

16. At H&R Block, I worked with George Shirley and Justin Romero as a team we called the "Capitol Group." Mr. Shirley and I were producing financial advisors. Mr. Romero was a licensed sales assistant. We started working together in early 2003. We all had a contract to work together as a team. I do not believe that H&R Block was a party to that contract.

17. Each of the three of us brought different, but complementary, skills, experience, and knowledge to service clients. Working together, we were able to provide superior service and assistance to clients. At H&R Block, we worked with a group of about 700 client households, representing approximately $150 million in assets under management.

18. The three of us evaluated the potential opportunity at SunTrust but we each made our own independent decisions on what to do. I did not force anyone to decide to work at SunTrust, nor did they force me to do so.

19. H&R Block has also mentioned Sarah Klawitter in the lawsuit. I did not recruit Sarah Klawitter to join SunTrust. I had no discussion with her at all about SunTrust or about her leaving H&R Block.

20. Before the three of us resigned, we contacted less than 75 clients to let them know that, effective January 13, 2006, we expected to be leaving H&R Block. We did this as a courtesy,

and as an informational call, because we felt that there were some clients who simply deserved the courtesy of advance notice. We did not want them to hear after the fact that we had left, because we were afraid that this would make them angry. We did not tell anyone that we were going to SunTrust unless they asked, and we did not solicit anyone to move their accounts to SunTrust.

21. After we resigned, we let clients know that we had left H&R Block and we gave them information on where to contact us. We sent out approximately 397 letters on January 10, 2006 in the form attached to our opposition as Exhibit "E."

22. We sent these letters so that these clients would know that we had left H&R Block, they would know how to contact us if they wished to do so, and they would be able to exercise their choice as to where their financial accounts would be serviced. Some clients have decided to transfer their accounts to SunTrust, which is their choice.

23. We had intended to resign from H&R Block on January 13, 2006, but we resigned several days earlier because H&R Block was asking us questions about our future plans. We actually had resignation letters printed out and signed before Mr. Brezovec came to see us on January 9, 2006. (The date in Mr. Brezovec's Declaration is incorrect.)

24. We did not destroy any H&R Block customer financial information, holding pages, account statements, or any other confidential or financial documents prior to or since our resignation from H&R Block. We left files containing that information in the H&R Block office when we resigned. We only copied certain information in the interest of servicing clients, providing continuity of service for clients who want to continue to work with us, and to enable us to contact clients to let them know where we can be located. We have already sent to our counsel all copies that we made and we have not retained copies or information taken from them. The spreadsheet used to provide the information to send out the mailings has been deleted.

25. When we resigned, we did not alter or delete any programs or files or take any actions that would interfere with the operations of the computer. I actually left my computer turned on and logged in when I resigned and left the office, and so everything on the computer was immediately and fully accessible to H&R Block. All information on clients, in the computer or otherwise, was left fully available to H&R Block. H&R Block was fully capable of identifying, locating, and contacting all clients after my resignation.

26. I am aware that Mr. Brezovec has speculated in a Supplemental Declaration that there was a client file from which the contents were taken. I did not take the contents out of any file. I did not destroy or hide any records. I am not sure which file he is referring to, but it was not unusual for the branch to have empty files. This happened because when accounts were transferred between branches, the transferring branch was supposed to, but often did not, copy the file and send it to the transferee branch. In any case, H&R Block maintains a master file for every client which is located outside of the branch, and which H&R Block has complete access to.

27. I contacted clients because I owe a fiduciary duty to my clients as their broker to keep them informed of my whereabouts and to provide them information so they can get in touch with me regarding their investments, even if they decide to keep their investments with H&R Block. I have a continuing responsibility and possible liability to them if there are losses in their accounts due to the investment advice I provided previously to them. In light of the recent state of the market and its constant fluctuations, including the recent gains in the market and the fact that tax season is approaching, this necessity for communication is even more essential.

28. When I contacted my clients, some had requested information on what they must do to transfer their accounts. I only discussed this option with the clients if they initiated the discussion by asking questions about transferring their accounts.

29. There is another important reason why I have needed to contact my clients. H&R Block has been in touch with them, and at least one client has told me that H&R Block informed him that we had been "fired" from H&R Block. Especially in view of what H&R Block is telling clients, I needed to notify clients after leaving H&R Block of my present address and telephone number.

30. When I was hired by H&R Block in 1994 (when the firm was called, "OLDE Discount Corporation"), I was told to sign the "Stockbroker Trainee Agreement" that is Exhibit "A" to the Complaint in this case. I was not given any opportunity to negotiate any of the terms of the Agreement. I was simply told that I had to sign it and that I had no other choice. I felt that I had no choice but to sign the Agreement, and that it why I did so.

31. The clients I have serviced were developed through my own hard work. I had to work to develop relationships with clients and to gain their trust and confidence.

32. I am not aware of any client relationships that were generated by any H&R Block advertising campaign, mailers, or "walk-in" or "call-in" customers.

33. My prior employment with H&R Block does not preclude me from accepting transfers of accounts from clients who want to transfer their accounts. In fact, industry rules require firms to transfer accounts within three to five days of a client's request to transfer.

34. Any efforts by H&R Block to restrict any contact with my long-time clients would interfere with the client's right to do business with the broker and brokerage firm of their choice, without allowing them a meaningful voice in selecting the eventual broker to handle their accounts.

35. An inability to notify clients after leaving H&R Block may unduly prejudice them with regard to their investments, which I initially advised them to purchase, especially in the

current market. It may also prejudice me and make me liable for any damages due to my inability to communicate with them, possibly risk the loss of my business reputation, and subject me to things that might impact my industry license.

36. If I am unable to communicate with my clients and losses occurred, I will not only be exposed to financial damages, but my reputation as a broker will be damaged. No amount of damages could return my good name or my license and therefore, I do not have an adequate remedy at law.

37. I am aware that when H&R Block hires new brokers from other brokerage firms, H&R Block encourages these new brokers to bring client names, addresses, and account information and to transfer as much business as possible from their prior firms.

38. During the time I was employed by H&R Block, I was involved extensively in H&R Block's recruitment and hiring practices and I observed extensively H&R Block's standard operating procedures for recruitment and hiring. I was constantly told that I needed to recruit experienced brokers with books of business to bring to H&R Block.

39. The procedure for new recruits was to instruct them to provide information on the client names, addresses, and titles of accounts for the clients they were servicing at their prior firm. They were instructed to provide this information before they resigned. H&R Block would take the information and prepare a spreadsheet listing all of the data, and the spreadsheet would be given to an outside company called Broker to Broker. Broker to Broker would generate announcement letters, account applications, and account transfer forms to be mailed in "packets" to clients when the broker resigned from his or her former firm. The packets are prepared so that they can be sent out immediately. They have large red stickers on them referring to "important information on your

8

former financial advisor," including the name of the broker. The packets are all then sent to the branch so they can be sent out when the broker begins his or her employment.

40. The normal practice is to inform the recruit not to provide advance notice to the former employer, and to resign over a weekend if possible. Of the people I was involved in hiring, I followed this procedure. One resigned just before the Thanksgiving holiday. H&R Block specifically commended and praised me for my coordinating these new hires.

41. I am not sure if all of these procedures were in writing, but many were in writing. H&R Block had a web site where at least some of these procedures were outlined.

42. New hires were actively encouraged and told to move their books of business to H&R Block, and they were specifically told to bring as much business over as possible from the former firms. In addition to written solicitations to clients, which were encouraged and directed by H&R Block, new brokers are encouraged by H&R Block to contact their clients from the former brokerage firm verbally and by all other means possible to inform those clients of their brokers' whereabouts.

43. In my experience in over a decade in the securities industry and at H&R Block, brokers never give advance notice of plans to resign before they actually resign. During my time at H&R Block, 20-25 financial advisors left and went to other firms. They did not give advance notice of their resignation. H&R Block, to my knowledge, did not pursue legal actions against any of them.

44. H&R Block has all the information at its disposal to contact clients, to reassign them to other brokers, and to solicit them actively from all three of its offices in the metropolitan Washington, D.C. area.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 20, 2006.

_____
J. Derek Majkowski

10