# Exhibit "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| H&R BLOCK FINANCIAL ADVISORS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>J. DEREK MAJKOWSKI, )<br>GEORGE SHIRLEY, and JUSTIN ROMERO, )<br>)<br>Defendants. ) | Case No. 1:06-CV-00057 (JR)<br>Judge James Robertson |

## **DECLARATION OF GEORGE SHIRLEY**

George Shirley, being duly sworn, deposes and states as follows:

1.  My name is George Shirley. I am over the age of eighteen and competent to testify herein.

2.  I am a Certified Financial Planner employed by SunTrust Investment Services, Inc. in its offices in Vienna, Virginia. I have been working there since January 9, 2006.

3.  On January 9, 2006, I resigned from H&R Block Financial Advisors, Inc., where I had been working in H&R Block's District of Columbia offices, and began working at SunTrust in its Vienna, Virginia office.

4.  There were no contractual or other restrictions upon my ability to resign from H&R Block and accept a position elsewhere. For example, I was not required to give H&R Block any advance notice of my resignation.

5.  The main reason I resigned from H&R Block was that SunTrust was a better opportunity for me personally and offers greater investment opportunities and services for brokerage clients. I found that SunTrust offered a superior platform for support for new client relationships. I thought it would help me both in marketing to new clients, obtaining more

opportunities for client referrals, and offering additional and superior products and services to clients.

6. I was also unhappy with the direction that H&R Block appeared to be moving in. For example, I attended a recruiting meeting in approximately the Spring of 2005. Michael Brezovec ran the meeting, and invited a group of H&R Block employees who were involved in recruiting to attend. He said at the meeting that the strength of H&R Block was in the people in the room, not with H&R Block (the company). He said that the company's brand and image made it difficult to recruit, but that our strategy had to be to use the talent of the people in the room to sell ourselves to potential recruits. We were told that the plan was for us to contact everyone we knew in the securities industry and explain the benefits of the Company and this area specifically, and if they were not personally interested, to let anyone they knew that might be looking to change firms to keep us in mind. I left the meeting skeptical. Shortly thereafter, Mr. Brezovec sent an email that he was disappointed in the strategy we came up with, even though he was a part of it. At this point I seriously questioned the direction and leadership of the firm and the D.C. area specifically, and essentially decided that contacting some of the other people in the securities industry would be a very good way for me to see what opportunities existed at other firms.

7. I also confronted many occasions where services we were supposed to be able to provide to clients were not available. H&R Block supposedly had tax expertise, which was theoretically the foundation for the business, but the tax professionals who were supposed to be available to clients were generally unavailable between May and December, meaning that clients who had tax questions had difficulty receiving a timely response. I was frustrated by this.

8. I also found that tax professionals within the company were not referring clients to H&R Block, but were sending them to other brokerage firms such as Fidelity. It was devastating to

me that our own coworkers did not have faith in our platform, or were oblivious to the need to cross-sell within the company.

9. After attending an Elite Advisor conference in June and after participating on the Company Advisory Board in November, I became skeptical of the abilities of Senior Management. I felt that the Executive Vice President of the firm had a strong accounting background, but did not fully understand the securities industry, nor the mentality of Advisors. I also felt that the National Sales Director had significant industry knowledge, but was not delivering a clear vision for the firm. Shortly before I resigned, a Divisional Director, Chris Zelesnik, essentially reaffirmed this feeling as he told me over dinner that he had similar opinions. I found it disturbing that he would tell this to me, but it ultimately made the decision to leave seem that much more necessary.

10. I feel like I stuck things out as long as I could with H&R Block, but things were not improving and the future was bleak.

11. I had seen the possibilities offered by a bank platform such as SunTrust, because I had interviewed with Wachovia back in 2003. I had this background in mind when I began looking at SunTrust.

12. I started working for H&R Block in 1997 as a financial advisor, when the Company was called "OLDE Discount Corporation."

13. I know Michael Depirri, a SunTrust employee who used to work at H&R Block. He did not recruit me to come to SunTrust. He did not encourage me to leave H&R Block. He did not persuade me to consider SunTrust or take a job at SunTrust. I made the decision on my own to approach SunTrust about possible employment. Ultimately, I decided to join SunTrust because of the opportunities that were presented, and not because Mr. Depirri worked at SunTrust.

14.     At H&R Block, I worked with Derek Majkowski and Justin Romero as a team we called the "Capitol Group." Mr. Majkowski and I were producing financial advisors. Mr. Romero was a licensed sales assistant. We started working together in early 2003. We all had a contract to work together as a team. I do not believe that H&R Block was a party to that contract.

15.     Clients benefited in tangible, significant ways from the skills and service that each of the three of us brought to bear.

16.     The three of us evaluated the potential opportunity at SunTrust but we each made our own independent decisions on what to do. I did not force anyone to decide to work at SunTrust, nor did they force me to do so.

17.     H&R Block has also mentioned Sarah Klawitter in the lawsuit. I did not recruit Sarah Klawitter to join SunTrust. I had no discussion with her at all about SunTrust or about her leaving H&R Block.

18.     Before the three of us resigned, we contacted less than 75 clients to let them know that, effective January 13, 2006, we expected to be leaving H&R Block. We did this as a courtesy, and as an informational call, because we felt that there were some clients who simply deserved the courtesy of advance notice. We did not want them to hear after the fact that we had left, because we were afraid that this would make them angry. We did not tell anyone that we were going to SunTrust unless they asked, and we did not solicit anyone to move their accounts to SunTrust.

19.     After we resigned, we let clients know that we had left H&R Block and we gave them information on where to contact us. We sent out approximately 397 letters on January 10, 2006 in the form attached to our opposition as Exhibit "E."

20.     We sent these letters so that these clients would know that we had left H&R Block, they would know how to contact us if they wished to do so, and they would be able to exercise their

choice as to where their financial accounts would be serviced. Some clients have decided to transfer their accounts to SunTrust, which is their choice.

21. We had intended to resign from H&R Block on January 13, 2006, but we resigned several days earlier because H&R Block was asking us questions about our future plans. We actually had resignation letters printed out and signed before Mr. Brezovec came to see us on January 9, 2006. (The date in Mr. Brezovec's Declaration is incorrect.)

22. We did not destroy any H&R Block customer financial information, holding pages, account statements, or any other confidential or financial documents prior to or since our resignation from H&R Block. We left files containing that information in the H&R Block office when we resigned. We only copied certain information in the interest of servicing clients, providing continuity of service for clients who want to continue to work with us, and to enable us to contact clients to let them know where we can be located. We have already sent to our counsel all copies that we made and we have not retained copies or information taken from them. The spreadsheet used to provide the information to send out the mailings has been deleted.

23. When we resigned, we did not alter or delete any programs or files or take any actions that would interfere with the operations of the computer. I actually left my computer turned on and logged in when I resigned and left the office, and so everything on the computer was immediately and fully accessible to H&R Block. All information on clients, in the computer or otherwise, was left fully available to H&R Block. H&R Block was fully capable of identifying, locating, and contacting all clients after my resignation.

24. I am aware that Mr. Brezovec has speculated in a Supplemental Declaration that there was a client file from which the contents were taken. I did not take the contents out of any file. I did not destroy or hide any records. I am not sure which file he is referring to, but it was not

unusual for the branch to have empty files. This happened because when accounts were transferred between branches, the transferring branch was supposed to, but often did not, copy the file and send it to the transferee branch. In any case, H&R Block maintains a master file for every client which is located outside of the branch, and which H&R Block has complete access to.

25. I contacted clients because I owe a fiduciary duty to my clients as their broker to keep them informed of my whereabouts and to provide them information so they can get in touch with me regarding their investments, even if they decide to keep their investments with H&R Block. I have a continuing responsibility and possible liability to them if there are losses in their accounts due to the investment advice I provided previously to them. In light of the recent state of the market and its constant fluctuations, including the recent gains in the market and the fact that tax season is approaching, this necessity for communication is even more essential.

26. When I contacted my clients, some had requested information on what they must do to transfer their accounts. I only discussed this option with the clients if they initiated the discussion by asking questions about transferring their accounts.

27. There is another important reason why I have needed to contact my clients. H&R Block has been in touch with them, and at least one client has told me that H&R Block informed him that we had been "fired" from H&R Block. Especially in view of what H&R Block is telling clients, I needed to notify clients after leaving H&R Block of my present address and telephone number.

28. When I was hired by H&R Block in 1997 (when the firm was called, "OLDE Discount Corporation"), I was told to sign the "Stockbroker Trainee Employment Agreement and Restrictive Covenants" that is Exhibit "B" to the Complaint in this case. I was not given any opportunity to negotiate any of the terms of the Agreement. I was simply told that I had to sign it

and that I had no other choice. I felt that I had no choice but to sign the Agreement, and that it why I did so.

29.    The clients I have serviced were developed through my own hard work. I had to work to develop relationships with clients and to gain their trust and confidence.

30.    My prior employment with H&R Block does not preclude me from accepting transfers of accounts from clients who want to transfer their accounts. In fact, industry rules require firms to transfer accounts within three to five days of a client's request to transfer.

31.    Any efforts by H&R Block to restrict any contact with my long-time clients would interfere with the client's right to do business with the broker and brokerage firm of their choice, without allowing them a meaningful voice in selecting the eventual broker to handle their accounts.

32.    An inability to notify clients after leaving H&R Block may unduly prejudice them with regard to their investments, which I initially advised them to purchase, especially in the current market. It may also prejudice me and make me liable for any damages due to my inability to communicate with them, possibly risk the loss of my business reputation, and subject me to things that might impact my industry license.

33.    If I am unable to communicate with my clients and losses occurred, I will not only be exposed to financial damages, but my reputation as a broker will be damaged. No amount of damages could return my good name or my license and therefore, I do not have an adequate remedy at law.

34.    I am aware that when H&R Block hires new brokers from other brokerage firms, H&R Block encourages these new brokers to bring client names, addresses, and account information and to transfer as much business as possible from their prior firms.

35. In my experience in over eight years in the securities industry and at H&R Block, brokers never give advance notice of plans to resign before they actually resign.

36. H&R Block has all the information at its disposal to contact clients, to reassign them to other brokers, and to solicit them actively from all three of its offices in the metropolitan Washington, D.C. area.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 20, 2006.

George Shirley