# Exhibit "C"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| H&R BLOCK FINANCIAL ADVISORS, INC.,  )<br>  )<br>          Plaintiff,  )<br>  )<br>v.  )<br>  )<br>J. DEREK MAJKOWSKI,  )<br>GEORGE SHIRLEY, and JUSTIN ROMERO,  )<br>  )<br>          Defendants.  ) | Case No. 1:06-CV-00057 (JR)<br>Judge James Robertson |

## DECLARATION OF JUSTIN ROMERO

Justin Romero, being duly sworn, deposes and states as follows:

1. My name is Justin Romero. I am over the age of eighteen and competent to testify herein.

2. I am employed by SunTrust Investment Services, Inc. in its offices in Vienna, Virginia. I have been working there since January 10, 2006.

3. On January 9, 2006, I resigned from H&R Block Financial Advisors, Inc., where I had been working in H&R Block's District of Columbia offices, and began working at SunTrust in its Vienna, Virginia office.

4. There were no contractual or other restrictions upon my ability to resign from H&R Block and accept a position elsewhere. For example, I was not required to give H&R Block any advance notice of my resignation.

5. I resigned from H&R Block because I was and had been unhappy there, and I thought that the opportunity to work at SunTrust would be better and more fulfilling for me, and better for clients.

6. I originally started working for H&R Block in 2001.

7. I know Michael Depirri, a SunTrust employee who used to work at H&R Block. He did not recruit me to come to SunTrust. He did not encourage me to leave H&R Block. He did not persuade me to consider SunTrust or take a job at SunTrust. I made the decision on my own to approach SunTrust about possible employment. I did not join SunTrust because Mr. Depirri worked at SunTrust.

8. At H&R Block, I worked with Derek Majkowski and George Shirley as a team we called the "Capitol Group." Mr. Majkowski and Mr. Shirley were producing financial advisors. I was a licensed sales assistant.

9. Clients benefited in tangible, significant ways from the skills and service that each of us provided.

10. I have been very frustrated and felt "burnt out" at H&R Block for a long time. One major source of frustration was that I spent a great deal of time trying to interface with various H&R Block tax offices to try and promote client referrals and cross-selling. Ultimately, this took a great deal of my time and was a waste of time.

11. My duties as a sales assistant were also made much more difficult and unpleasant by severe downsizing and cost-cutting within the Company. From the main office in Detroit, Michigan, severe measures were being taken that included taking away the ability for clients to work with or modify accounts on line (meaning that I had to process things myself that could have been done on line), costs and staff were being cut, and "back office" support was reduced greatly.

12. I also saw that service to clients was suffering. Account fees were being raised.

13. I was not sure of the direction that H&R Block wanted to go. The company's Chief Executive Officer was quoted in *The Wall Street Journal* saying that H&R Block was focusing on

smaller producers and smaller accounts, hoping to make profit by becoming a high-volume firm. I had a background in the securities industry, having worked at Legg Mason before coming to H&R Block, and this was not the kind of environment in which I wanted to work. Making matters worse, many clients saw this and similar public comments from the company, and mentioned them to me in a negative way. Clients also mentioned bad publicity that H&R Block and its parent company had over problems with H&R Block's "rapid refund" service, including money held up from customers, social security information mistakenly put on the outside of envelopes, and other problems that caused us negative impact by association.

14. I did not like what was happening at H&R Block and I was looking on my own at other firms, including Chevy Chase and Raymond James. Mr. Majkowski and Mr. Shirley did not ask me to leave H&R Block. I approached them on my own and asked them if they ever left, to let me know as I was unhappy at H&R Block.

15. I did not recruit Sarah Klawitter to join SunTrust. I had no discussion with her at all about SunTrust or about her leaving H&R Block. I had no idea she was leaving H&R Block or going to SunTrust.

16. Before the three of us resigned, we contacted less than 75 clients to let them know that, effective January 13, 2006, we expected to be leaving H&R Block. We did this as a courtesy, and as an informational call, because we felt that there were some clients who simply deserved the courtesy of advance notice. We did not want them to hear after the fact that we had left, because we were afraid that this would make them angry. We did not tell anyone that we were going to SunTrust unless they asked, and we did not solicit anyone to move their accounts to SunTrust.

17. I did not solicit any clients to leave SunTrust. Unless clients brought it up to me, I did not tell them we were going to SunTrust and I did not discuss the transfer of their accounts.

Having already been through one change of jobs in the securities industry, I was careful not to solicit any client. I have seen Michael Brezovec's statement saying that apparently someone else told him that a client told that person that we were leaving and I "had asked the client to transfer his account to SunTrust." I did not make this request of any client. This statement is false.

18. After we resigned, we let clients know that we had left H&R Block and we gave them information on where to contact us. We sent out approximately 397 letters on January 10, 2006 in the form attached to our opposition as Exhibit "E."

19. We sent these letters so that these clients would know that we had left H&R Block, they would know how to contact us if they wished to do so, and they would be able to exercise their choice as to where their financial accounts would be serviced. Some clients have decided to transfer their accounts to SunTrust, which is their choice.

20. We had intended to resign from H&R Block on January 13, 2006, but we resigned several days earlier because H&R Block was asking us questions about our future plans. We actually had resignation letters printed out and signed before Mr. Brezovec came to see us on January 9, 2006. (The date in Mr. Brezovec's Declaration is incorrect.)

21. We did not destroy any H&R Block customer financial information, holding pages, account statements, or any other confidential or financial documents prior to or since our resignation from H&R Block. We left files containing that information in the H&R Block office when we resigned. We only copied certain information in the interest of servicing clients, providing continuity of service for clients who want to continue to work with us, and to enable us to contact clients to let them know where we can be located. We have already sent to our counsel all copies that we made and we have not retained copies or information taken from them. The spreadsheet used to provide the information to send out the mailings has been deleted.

22.  When we resigned, we did not alter or delete any programs or files or take any actions that would interfere with the operations of the computer. I actually left my computer turned on and logged in when I resigned and left the office, and so everything on the computer was immediately and fully accessible to H&R Block. All information on clients, in the computer or otherwise, was left fully available to H&R Block. H&R Block was fully capable of identifying, locating, and contacting all clients after my resignation.

23.  I am aware that Mr. Brezovec has speculated in a Supplemental Declaration that there was a client file from which the contents were taken. I did not take the contents out of any file. I did not destroy or hide any records. I am not sure which file he is referring to, but it was not unusual for the branch to have empty files. This happened because when accounts were transferred between branches, the transferring branch was supposed to, but often did not, copy the file and send it to the transferee branch. In any case, H&R Block maintains a master file for every client which is located outside of the branch, and which H&R Block has complete access to.

24.  There is another important reason why I have needed to contact my clients. H&R Block has been in touch with them, and at least one client has told me that H&R Block informed him that we had been "fired" from H&R Block. A financial advisor at H&R Block told me the same thing. Especially in view of what H&R Block is telling clients, I needed to notify clients after leaving H&R Block of my present address and telephone number. Inaccurate information of this sort can damage my reputation permanently.

25.  When I was hired by H&R Block in 2001, I was told to sign the "Financial Advisor Employment Agreement and Restrictive Covenants" that is Exhibit "B" to the Complaint in this case. I was not given any opportunity to negotiate any of the terms of the Agreement. I was simply

told that I had to sign it and that I had no other choice. I felt that I had no choice but to sign the Agreement, and that it why I did so.

26. I am not aware of any client relationships that were generated by any H&R Block advertising campaign, mailers, or "walk-in" or "call-in" customers.

27. My prior employment with H&R Block does not preclude me from accepting transfers of accounts from clients who want to transfer their accounts. In fact, industry rules require firms to transfer accounts within three to five days of a client's request to transfer.

28. Any efforts by H&R Block to restrict any contact with my long-time clients would interfere with the client's right to do business with the broker and brokerage firm of their choice, without allowing them a meaningful voice in selecting the eventual broker to handle their accounts.

29. An inability to notify clients after leaving H&R Block may unduly prejudice them with regard to their investments, which I initially advised them to purchase, especially in the current market. It may also prejudice me and make me liable for any damages due to my inability to communicate with them, possibly risk the loss of my business reputation, and subject me to things that might impact my industry license.

30. If I am unable to communicate with my clients and losses occurred, I will not only be exposed to financial damages, but my reputation as a broker will be damaged. No amount of damages could return my good name or my license and therefore, I do not have an adequate remedy at law.

31. I am aware that when H&R Block hires new brokers from other brokerage firms, H&R Block encourages these new brokers to bring client names, addresses, and account information and to transfer as much business as possible from their prior firms.

32. In my experience in over eight years in the securities industry and at H&R Block, brokers never give advance notice of plans to resign before they actually resign.

33. H&R Block has all the information at its disposal to contact clients, to reassign them to other brokers, and to solicit them actively from all three of its offices in the metropolitan Washington, D.C. area.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 20, 2006.

_____
Justin Romero

- 7 -