# Exhibit "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| H&R BLOCK FINANCIAL ADVISORS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:06-CV-00057 (JR) |
| ) | Judge James Robertson |
| J. DEREK MAJKOWSKI, ) | |
| GEORGE SHIRLEY, and JUSTIN ROMERO, ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF MICHAEL DEPIRRI

Michael Depirri, being duly sworn, deposes and states as follows:

1. My name is Michael Depirri. I am over the age of eighteen and competent to testify herein.

2. I am a Regional Sales Manager for SunTrust Investment Services, Inc. in its offices in Vienna, Virginia. I have been working there since October 3, 2005. I did not "set up" the SunTrust office where I work. It is an existing office that has been there for many years.

3. On September 30, 2005, I resigned from H&R Block Financial Advisors, Inc., where I had been working as a Regional Director covering a territory consisting of twelve branch offices in the Philadelphia, Baltimore, and Washington, D.C. metropolitan areas. My job responsibilities included recruiting and assisting and training in sales. While at H&R Block, I was the immediate supervisor of Michael Brezovec. As a Regional Director at H&R Block, I had direct supervisory responsibility over four Complex Managers (including Mr. Brezovec), who in turn supervised approximately seventy licensed financial advisors.

4. I worked with H&R Block since March 1993 (when the firm was known as OLDE Discount Company). I was interested in leaving H&R Block to take a position with a

more local territory for several reasons, including that covering the Philadelphia/Baltimore/Washington metropolitan areas for H&R Block was very time consuming.

5. I did not recruit Derek Majkowski, George Shirley, and Justin Romero to come to SunTrust. After I resigned from H&R Block, they indicated to me that they were pursuing other opportunities and were going to leave H&R Block. They expressed interest, which I did not solicit in advance, in possible opportunities at SunTrust. They indicated to me a number of reasons that they were interested in leaving H&R Block, including that they were not satisfied with the platform offered by H&R Block. They indicated to me that they were not satisfied with the products and services available to clients at H&R Block. They also indicated that they did not believe that the longterm opportunities for them to grow their business were very good at H&R Block.

6. H&R Block has also mentioned Sarah Klawitter in the lawsuit. I did not recruit Sarah Klawitter to join SunTrust. She approached me after I resigned from H&R Block and said she was interested in seeking possible employment with SunTrust for a number of reasons, including the fact that she lived in Northern Virginia and did not like her commute to and from Rockville, Maryland. She also expressed that she was interested in the opportunities that would be available to her and to clients on a bank platform such as that offered at SunTrust.

7. I have never solicited any employee of H&R Block to leave H&R Block at any time. I never suggested to any H&R Block employee that he or she should pursue employment at SunTrust. All of these individuals have approached me.

8. When I resigned from H&R Block and went to SunTrust, I had no animosity towards H&R Block. At H&R Block, I was covering a large territory in three different states. There were significant travel requirements for the job, and the SunTrust opportunity permitted me to

work exclusively in the Washington, D.C. metropolitan area. This is why I joined SunTrust. I took the opportunity because it was better for me and better for my family.

9. When I left H&R Block, I spoke with many employees of H&R Block about the fact that I was resigning. I did not do this in secret, and it was well known to H&R Block that I had these discussions. One of the employees I spoke with was Mr. Majkowski. I told Mr. Majkowski, as I told everyone else, nothing but good things about H&R Block. I did not "bad mouth" H&R Block on my way out the door.

10. In over three months at SunTrust, in contrast to H&R Block's implications, I have not been involved in soliciting H&R Block employees to come to SunTrust. I have reviewed Mr. Brezovec's Declaration. In Paragraph 13, for example, he claims that someone told him that I "insinuated to another HRBFA manager that [I] planned to recruit many more HRBFA brokers in the near future." This is false. I did not say any such thing, nor did I "insinuate" any such thing. Nor do I have any such "plan."

11. I have not opened a new SunTrust office (as mentioned, the office where I work has been there for years), nor have I operated an office focused on recruiting H&R Block employees.

12. During the time I was employed by H&R Block, I was involved extensively in H&R Block's recruitment and hiring practices and I observed extensively H&R Block's standard operating procedures for recruitment and hiring. I was told that the most important goal for my position was to recruit experienced brokers with "books of business" to bring to H&R Block. I am not sure if all of these procedures were in writing, but many were in writing. H&R Block had a major recruiting meeting in the spring or summer of 2005 where written materials concerning recruitment were given out. I do not have those materials but H&R Block would have copies.

13. H&R Block had standard procedures that were followed during the time I was employed by H&R Block. H&R Block was actively involved in locating and recruiting experienced financial advisors with books of business to bring to H&R Block. Not only was hiring these individuals an essential part of the job of managers at H&R Block, but making sure that they brought clients with them was also mandated. Individuals were not considered by H&R Block to be "qualified recruits" unless they brought at least 30% of their books of business over from their former firms.

14. In fact, during my employment with H&R Block, I was constantly told by Chris Zelesnick (H&R Block's Divisional Director) to locate and hire Complex Managers who could bring several experienced financial advisors with them.

15. For example, after the acquisition of Legg Mason's brokerage division by Citigroup/Smith Barney was announced in April 2005, Mr. Zelesnick instructed me to look at the locations of various Legg Mason and Citigroup/Smith Barney offices. He said that I should identify such offices and then identify possible Branch Office Managers at those locations to try and recruit them to leave and join H&R Block as Complex Managers and to bring several experienced financial advisors with them.

16. In 2005, for another example, H&R Block hired a Complex Manager in Ohio from a competing firm as well as, either with the Complex Manager or separately, several experienced financial advisors from a competing firm.

17. In addition, in the months before I left H&R Block, I was instructed to locate a suitable Complex Manager to be hired at H&R Block as a replacement for Mr. Brezovec (who would then be demoted). My instructions from Mr. Zelesnick on a number of occasions were to find an individual who was part of a team and could bring with him or her 2-3 financial advisors

4

with books of business, so that such an individual could be hired to replace Mr. Brezovec as a Complex Manager.

18. When H&R Block hired financial advisors from other firms, the standard procedure was to urge the financial advisors to resign before a weekend. They were told that a three day weekend was optimal, and should be selected if possible, to permit several days of client contact and solicitation before the former firm would be able to react to the resignations. They were also told not to give the former firm any advance notice of the plans to resign. H&R Block even has a pre-formatted resignation letter which it gives recruits, and it includes a statement that any correspondence should be directed to H&R Block's counsel rather than directly to the recruits (so that any such post-resignation direct contact would be prevented).

19. When H&R Block hired financial advisors from other firms, the standard procedure was also to direct those financial advisors to put together all client names and addresses, account information, as well as any other helpful information that they could obtain, to help contact and solicit those clients to come to H&R Block. H&R Block thus actively encourages new brokers to bring client name, address, and account information from their prior firms.

20. H&R Block gives direct financial incentives for newly hired brokers to transfer their books of business. These incentives include "up front money" payments of 50% of the broker's "trailing 12" gross commissions (*i.e.*, the gross commissions generated in the prior twelve months, as documented in advance with proof in the form of commission runs or other similar documentation acceptable to H&R Block), enhanced commission payouts of as much as a 50% for the first year of employment, and payments of 50 basis points per $1 million in assets transferred over the first 120 days on the job. H&R Block thus actively encourages new brokers to transfer clients and commission production from their prior firms.

21. H&R Block would place the financial advisors in touch with a third party service such as "Broker to Broker," a company that compiles mailings to clients, consisting of letters announcing the change of employment and asking the clients to move their accounts to H&R Block and the forms necessary to process an account transfer. H&R Block would put together spreadsheets listing client names, addresses, and account information, so that the letters and transfer forms could be prepared using that information. H&R Block would be the intermediary between Broker to Broker (although that procedure was recently changed so that H&R Block directs the brokers to contact Broker to Broker directly). Letters and other information would be compiled even before the financial advisors resigned, so that the information could be sent at the same time (and even before) the actual resignation. This procedure was directed and encouraged by H&R Block.

22. New hires were actively encouraged and told to move their books of business to H&R Block, and they were specifically told to bring as much business over as possible from the former firms. In addition to written solicitations to clients, which were encouraged and directed by H&R Block, new brokers are encouraged by H&R Block to contact their clients from the former brokerage firm verbally and by all other means possible to inform those clients of their brokers' whereabouts.

23. In my experience in over a decade in the securities industry and during my 12 years at H&R Block, brokers never give advance notice of plans to resign before they actually resign. The procedure at H&R Block was that if a broker indicated he or she was considering resigning, their access to records was prevented and they were subject to immediate termination and to be escorted off the premises.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 20, 2006.

_____
Michael Depirri