IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| H&R BLOCK FINANCIAL ADVISORS, INC., ) ) ) ) | |
| Plaintiff, ) ) | No. 06-CV-00057-JR |
| v. ) ) | |
| J. DEREK MAJKOWSKI, JUSTIN ROMERO, ) and GEORGE SHIRLEY, ) ) | |
| Defendants. ) ) | |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

H&R Block Financial Advisors, Inc. ("HRBFA"), by its undersigned attorneys, hereby submits this Reply to Defendants' Opposition to Motion for Temporary Restraining Order and Preliminary Injunction.

At the outset, it should be noted that Defendants do not deny any of the material allegations that support issuance of a temporary restraining order, and indeed admit the key facts entitling HRBFA to relief. Specifically, the Defendants admit that they misappropriated copies of HRBFA client information, and also admit that they used these stolen documents to contact and HRBFA customers both before and after they resigned from HRBFA. These are the core allegations underlying HRBFA's complaint and motion, and there is absolutely no dispute about them. Defendants solicited HRBFA clients to follow them to their new employer and took records and information from HRBFA to assist in this wrongdoing. Because they obviously are in no position to deny these crucial facts, Defendants instead seek to distract attention from their

own egregious misconduct by raising a series of "defenses" that do not address the allegations and, in fact, are not really defenses at all.

## ARGUMENT

### 1.    Defendants' Own Declarations Demonstrate That They Have Breached Their Contracts and Misappropriated Trade Secrets.

Defendant puzzlingly argues that HRBFA has not provided sufficient evidence to support restraining Defendants from further violating their contracts and disseminating trade secrets. This argument fails for two reasons.   First, Defendants have **admitted** in their brief and Declarations that they took confidential HRBFA client information, **admitted** that they used this information to "contact" HRBFA clients about their move to SunTrust, **admitted** that some HRBFA clients have decided to transfer their accounts based on Defendants "contacts," and **admitted** that they signed the contracts attached as Exhibits A-C to HRBFA's Complaint.  See Exhibit A to Defendant's Opposition to Motion, at ¶¶21, 22, 24, 28 & 29 (hereafter "Majkowski Declaration"); Exhibit B to Defendant's Opposition to Motion, at ¶¶18, 19, 20, 22 (hereafter "Shirley Declaration"); Exhibit C to Defendant's Opposition to Motion, at ¶¶16, 18, 19 & 21 (hereafter "Romero Declaration").  This is all the evidence that is needed for the Court to grant a temporary restraining order to preserve the status quo until the parties' dispute is resolved in arbitration.

Second, it is well established that a temporary restraining order or "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  University of Texas v. Camenisch, 451 U.S. 390, 395 (1981); Natural Resources Defense Council v. Pena, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998).  This Court has recognized that "[a] preliminary injunction may be granted on the basis of affidavits alone where there is sufficient undisputed evidence to support preliminary relief."

SEC v. General Refractories Co., 400 F. Supp. 1248, 1256 (D.D.C. 1975). Moreover, courts around the country repeatedly have recognized that "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings." Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st Cir. 1986); see Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 718 (3d Cir. 2004); Ty, Inc. v. GMA Accessories, Inc., 132 F.3d 1167, 1171 (7th Cir. 1997); Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction...."); Sierra Club, Lone Star Chapter v. FDIC, 992 F.2d 545, 551 (5th Cir. 1993) (courts at preliminary injunction stage "may rely on otherwise inadmissible evidence, including hearsay"); Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction ... makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may even give inadmissible evidence some weight ...."); cf. Heideman v. South Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings."). As one court observed, in cases such as this, misappropriation and misuse of trade secrets can rarely be proved by direct evidence. Q-Co Industries, Inc. v. Hoffman, 625 F. Supp. 608, 618 (S.D. N.Y. 1985)("In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences...")(quoting Greenberg v. Croydon Plastics Co. Inc., 378 F. Supp. 806, 814 (E.D. Pa.1974)). The evidence adduced by HRBFA in the form of the Declarations of Mr. Brezovec is more than enough to support issuance of preliminary injunctive relief, especially when combined with Defendants' own admissions in their Declarations.[1]

---

[1] Defendant inexplicably cites to U.S. v. 69.1 Acres of Land, 942 F.2d 290, 292 (4th Cir. 1991), for the proposition that mere "suspicions concerning another part's conduct" do not justify injunctive relief. Even if the Defendants had

### 2.    HRBFA Has Demonstrated a Likelihood of Success.

The post-employment restrictive covenants in Defendants' agreements are fully enforceable under applicable law.[2]  Indeed, although Defendants spend substantial time in their opposition emphasizing their right to leave HRBFA and join another firm, that right is not in dispute.  Nothing in their Agreements purports to prohibit them from leaving HRBFA.  Nothing in HRBFA's requested order would prohibit Defendants from working for a competitor firm, or from doing business at SunTrust with the clients they serviced at HRBFA.  Rather, HRBFA only seeks to prohibit them from using HRBFA's records and information, and from soliciting and calling upon HRBFA clients –a  restraint that is even less restrictive than those to which Defendants specifically agreed as a condition of their employment.[3]

### a.    The Covenant is Fully Enforceable Under Both Michigan Law and District of Columbia Law.

Reasonable restraints similar to those being sought by HRBFA have been upheld again and again in federal and state courts throughout the country, including the District of Columbia courts in Ellis v. James Hurson Assoc., 565 A.2d 615, 610 (D.C. 1989), the Fourth Circuit in Merrill Lynch v. Bradley, 756 F.2d 1048 (4th Cir. 1985), the Michigan federal courts in Merrill

---

not already admitted all of the wrongdoing alleged in HRBFA's complaint, this case is inapplicable.  69.1 Acres involved the condemnation of land.  The court's sole conclusions relate to the property's value and there is no discussion – in dicta or otherwise – concerning injunctions.

[2] Here, the applicable restrictive covenants contain choice of law provisions identifying Michigan law as governing. District of Columbia courts historically honor choice of law provisions in contracts, including in agreements containing restrictive covenants.  See L.G. Balfour Co. v. McGinnis, 759 F. Supp. 840 (D.D.C. 1991) (honoring choice of law provision in restrictive covenant and applying Massachusetts law rather than law of forum); CIENA Corp. v. Jarrard, 203 F. 3d 312, 323 (4th Cir. 2000) (upholding Delaware choice of law clause in a restrictive covenant agreement, and holding that "a party's state of incorporation provides the necessary 'substantial relationship' for application of its laws,'" even though the company's principal place of business was in Maryland).  As explained more fully in HRBFA's initial memorandum, this Court should honor this chosen forum and apply Michigan law, which is the location of HRBFA's corporate headquarters.

[3] Defendants make much of the fact that they were "forced" to sign their Agreements in order to get their jobs.  Yet that is precisely the consideration underlying the covenant: they were not allowed to have the jobs unless they signed the covenant.  That was the deal, except now that they have reaped all of the benefits flowing to them under

Lynch v. Ran, 67 F. Supp.2d 764, 775 (E.D. Mich. 1999), Orbach v. Merrill Lynch, 1994 WL 900431 (E.D. Mich. 1993), Merrill Lynch v. Grall, 836 F. Supp. 428 (W.D. Mich. 1993), and Merrill Lynch v. Barnett, 1990 WL 303428 (W.D. Mich. 1990), and all of the other decisions cited in HRBFA's Initial Memorandum.  See Initial memorandum, at 8-9 and 10-11.

Moreover, the restraints contained in Defendants' restrictive covenants are equally enforceable under District of Columbia law.  See, e.g., Merrill Lynch v. Wertz, 298 F. Supp. 2d 27 (D.D.C. 2002) (granting temporary restraining order and upholding restrictive covenants preventing financial advisors from soliciting clients); Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67 (D.D.C. 2001) (upholding restrictive covenant preventing broker from competing with former employer financial services firm).  Defendants attempt to distinguish Rothe, by claiming that the covenant upheld in Rothe was less restrictive than the restraints requested against Defendants.  Yet the relief sought by HRBFA here is virtually identical.  Just as in Rothe, Defendants are permitted to leave HRBFA and work at a competitor.  Just as in Rothe, Defendants are free to continue working with clients who contact them and choose to move their accounts to SunTrust.  And, also just as the court stated in Rothe, "the Agreement does not prevent the defendant[s] from working for [their] new employer and from competing with [HRBFA] for the patronage of the public at large."  Rothe, 150 F. Supp. 2d at 75.  Accordingly, Defendants' restrictive covenants are reasonable and enforceable under District of Columbia law.

**b.     Injunctive Relief is Warranted under the Trade Secrets Act.**

HRBFA also is entitled to relief on the separate and independent basis of the Uniform Trade Secrets Act.  D.C. Code §§ 48-501 et seq.  Even in the absence of an express covenant such as the one signed by Defendants, District of Columbia courts have held that a securities

---

the arrangement, Defendants no longer want to live up to their end of the deal.

firm's customer list is a trade secret, and that a former broker must be enjoined from soliciting his former employer's trade secret customers. See, e.g., Rothe, 150 F. Supp. 2d 67 at 76 (indicating that many courts have granted customer lists trade-secret status under the Uniform Trade Secrets Act and under the corresponding Restatement standards). The Rothe court stated: "To the extent that this district has not had occasion to address the issue, this court now holds that the customer lists of a financial-services firm deserve trade-secret status under [the District of Columbia Trade Secrets Act] D.C. Code § 48-501." Id.; see also cases cited in Initial Memorandum, at 12-14.[4]

### c. The Court is Fully Empowered to Grant the Lesser Included Relief Sought by HRBFA.

In its motion for a temporary restraining order, HRBFA has sought less than all of the relief to which it is entitled under the terms of the Defendants' Agreements. Yet Defendants seek to punish HRBFA for its reasonableness in this regard. Specifically, Defendants claim that the Court has no power to grant HRBFA less relief than called for under the contract, argue that the contracts are overbroad, and thus conclude that no relief at all may be granted. This argument is incorrect for a number of reasons, in addition to the fact that – as discussed above – the relief sought by HRBFA is fully warranted under the separate and independent grounds of the Uniform Trade Secrets Act.

### i. The Agreements Stipulate That the Covenant Should be Enforced to an Extent The Court Finds Reasonable.

Defendants' argument that the Court lacks power to modify the covenant asks the Court

---

[4] Defendant asserts that somehow HRBFA's client list and information is not a trade secret because some other firms in the industry (including a SunTrust's broker-dealer) have signed the Protocol for Broker Recruitment, under which signatory firms permit their brokers to leave their employ and take client lists with them to other Protocol signatory firms. Defendants' argument makes no sense at all. HRBFA takes substantial measures to protect the confidentiality of its client list, and the fact that other firms may not do so is of no moment whatsoever. The case law holding securities firms customer lists to be trade secret is overwhelmingly against Defendants' position.

to ignore the specific language contained in two of the Defendants' Agreements with HRBFA. In each Agreement, the Defendants agreed that the Court should enforce the covenants to whatever extent the Court believes is reasonable:

> SEVERABILITY. **The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.** The invalid or unenforceable provision shall be stricken and the agreement shall continue in full force and effect as if the said invalid or unenforceable provision had no [sic] appeared therein.

See Majkowski's Agreement, Exhibit A to Complaint, at ¶17; Romero's Agreement, Exhibit B to Complaint, at ¶18 (emphasis added).

This is a specifically enforceable term of the parties' Agreement. Accordingly, if the Court believes the covenants at issue are overly broad because they apply to customers whom the Defendants did not personally service or about whom the Defendants did not gain information, these clauses stipulate that the Court may enforce the agreement as to those clients the Court believes the Defendants are appropriately restricted from soliciting. HRBFA's proposed order, which was granted by the court on the motion for temporary restraining order, is exactly the type of reasonable modification the parties agreed the Court would be empowered to engage in.

### ii.    The Requested Relief is Appropriate Under Michigan Law.

Under Michigan statutory law, even if the Court were to find that the Defendants' covenants are overly broad because they apply to all HRBFA clients rather than only those clients Defendants personally serviced or learned of, it is clear that a restrictive covenant may be judicially modified to be enforced in a way the Court deems reasonable:

> To the extent any such agreement or covenant is found to be unreasonable in any respect, **a court may limit the agreement to render it reasonable** in light of the circumstances in which it was made and specifically enforce the agreement as limited.

MICH. COMP. LAWS. ANN. §445.774a(1) (emphasis added). Courts applying this statute have modified restrictive covenants under circumstances similar to those presented in this case. For example, in <u>Frontier Corp. v. Telco Communications Group, Inc.</u>, 965 F. Supp. 1200 (S.D. Ind. 1997), an Indiana court sitting in diversity jurisdiction considered a restrictive covenant that purported to preclude a former employee from soliciting any of the employer's customers. Relying on §445.774a(1), the court found the covenant enforceable to the extent it applied to customers for whom the former employee was the assigned sales representative. <u>Frontier</u>, 965 F. Supp. at 1209. This, of course, is precisely the relief HRBFA seeks in this case.

Finally, there can be little doubt that the restrictive covenants, as modified, are fully enforceable under Michigan law. <u>See, e.g.</u>, <u>Merrill Lynch v. Ran</u>, 67 F. Supp.2d 764, 774, 783 (E.D. Mich. 1999) (finding similar restrictive covenant to be a "reasonable and enforceable anti-piracy provision" and enjoining former stockbrokers from soliciting clients whom they serviced or whose names became known to them during their employment with their former employer); <u>Merrill Lynch v. Grall</u>, 836 F. Supp. 428, 434 (W.D. Mich. 1993) (same).[5]

### iii. District of Columbia Law Does Not Preclude Modification or a Grant of Lesser Included Relief.

Defendants contend that the Court is not empowered under District of Columbia law to modify Defendants' covenants, if the Court were to determine they were not enforceable as written. This is not the law in the District of Columbia. In the very case cited by Defendants, the District of Columbia Court of Appeals affirmed a preliminary injunction that did not enforce the entire scope of the covenant as written. <u>Ellis v. James V. Hurson Assocs.</u>, 565 A.2d 615 (D.C. 1989). In <u>Ellis</u>, the covenant as written was virtually identical to the written covenants in this

---

[5] <u>See also</u> four Michigan published decisions cited in Section 2(a) above.

case, and the preliminary injunctive relief granted and affirmed by the appellate court was virtually identical to the temporary restraining order issued by the Court against Defendants in this case. Indeed, the court in Ellis rejected the view that covenants not to compete must be enforceable "in whole or not at all" and stated that the vast majority of courts enforce such covenants to the extent their terms are reasonable. Id. at 617. Contrary to the Defendants' assertions, the court in Ellis specifically affirmed the trial court's grant of a preliminary injunction virtually identical to the injunction sought by HRBFA in this case, and it did so on the basis of a covenant that likewise was virtually identical to the Defendants' covenants in this case. Id. In fact, perhaps most compellingly defeating Defendants' attempts to argue to the contrary, the court in Ellis expressly suggested that on remand a "an even further restriction in the scope of the injunction, such as to those clients actually serviced by Hurson while at Ellis, may be indicated in applying to this particular situation the limitations ... of Restatement section 188." 565 A.2d at 619. The "restriction in the scope of the injunction" suggested by the court of appeals in Ellis is the same one HRBFA voluntarily imposed on its own requested relief in the first instance in this matter.

The relief sought by HRBFA is reasonable under District of Columbia law. HRBFA clearly has a legitimate business interest in protecting its clients. The agreements are limited to three years or less after their termination,[6] which is the same period upheld in Ellis and courts have found that a longer period of time is reasonable. See, e.g., Meyer v. Wineburgh, 110 F. Supp. 957, 959 (D.D.C. 1953) (five years); Erikson v. Hawley, 12 F.2d 491 (D.C. 1926) (10 years). Additionally, the requested relief does not restrict Defendants from working for a competitor, but rather only seeks to protect HRBFA's customer base from being solicited away

---

[6] Majkowski's agreement includes a three-year restriction; Shirley's restriction is two years; and Romero's restriction is one year.

upon the departure of its employees.

### 3. HRBFA Will Suffer Irreparable Harm Without Continued Injunctive Relief.

Despite the clear holdings and affirmances of the Fourth, Fifth, Seventh, Tenth and Eleventh Circuits under identical circumstances in Merrill Lynch v. Bradley, Merrill Lynch v. Ruscitto, Merrill Lynch v. Salvano, Merrill Lynch v. Dutton, and Merrill Lynch v. Hegarty (cited and discussed in HRBFA's initial memorandum). Defendants contend that HRBFA somehow will not suffer irreparable harm, arguing that any harm suffered by HRBFA could be compensated by monetary damages in the pending arbitration. As stated above, HRBFA has clear evidence of conduct that is both irreparable and immeasurable. Moreover, in Bradley, for example, the Fourth Circuit concluded that Merrill Lynch "faced irreparable, noncompensable harm in the loss of customer" when the defendant-employee terminated his employment and began working at a competing brokerage firm. Id. at 1055. The court further held that the threat that the defendant would breach his employment agreement and solicit customers was an irreparable harm for the it was impossible to ascertain "with any accuracy the extent of the loss." Id.

HRBFA is in the same position as Merrill Lynch in Bradley, and therefore injunctive relief is appropriate. Defendants have admitted contacting at least 75 HRBFA customers *while they were still employed* with HRBFA and nearly 400 HRBFA customers after their resignation. Defendants further have admitted that some of these customers have decided to transfer their accounts to SunTrust. Defendants also admit they copied and retained confidential HRBFA documents regarding customer information and used it to contact HRBFA customers after they resigned. It will be impossible to determine HRBFA's damages with any reasonable degree of certainty because HRBFA's damages necessarily include every future (and currently

unknowable) investment in any account solicited or whose information Defendants misappropriated. As stated in <u>Bradley</u>, it is impossible to quantify the loss of even a single account. HRBFA clearly meets the test for irreparable harm, and injunctive relief is appropriate.

**4.    The Benefit of Injunctive Relief Far Outweighs Any Burden on Defendant.**

The benefit of injunctive relief to HRBFA far outweighs any detriment to Defendants. As stated in HRBFA's opening memorandum, an injunction would protect HRBFA's goodwill, business reputation, and contract rights. HRBFA will be irreparably harmed by the loss of even one client if Defendants are permitted to continue breaching their Agreements. Once a client an account is lost, "[t]he customers cannot be unsolicited." <u>Bradley</u>, 756 F.2d at 1054; <u>see FMC Corp. v. Varco, Inc.</u>, 677 F.2d 500, 504 (5th Cir. 1982) (emphasizing that absent immediate injunctive relief, an employer's trade secrets "could be lost before a full trial on the merits could be held").

In contrast, there is almost no burden on Defendants in requiring them to honor the terms of their valid non-solicitation, non-use and non-disclosure agreements, which they freely executed and for which they were compensated throughout their employment. The restraints requested are limited solely to HRBFA clients and prospects. The restraint does not limit Defendants' abilities to earn a living, and in particular Defendants "may continue to compete as a stock broker in the same locale. [Defendants are ] merely restricted for one year from soliciting clients whom [they] served or whose names became known to [them] while employed at [HRBFA]." <u>Ruscitto v. Merrill Lynch</u>, 777 F. Supp. 1349, 1354 (N.D. Tex. 1991).

In their Opposition, Defendants seem to suggest that they have not breached their agreements because they have merely announced their employment to HRBFA's customers, and that this does not constitute solicitation. This is contrary to both District of Columbia law and

Defendants' conduct.  The District of Columbia federal court considered a virtually identical

case in which the defendant made the same semantic argument, and held that the defendant's

contract was breached as a result of this conduct:

> The court is unpersuaded by the subtle distinction the defendant
> attempts to draw in this case between his action, which he labels an
> announcement, and solicitation, which is prohibited by his contract
> with Merrill Lynch.  It is a distinction without a difference in this
> case.  **Even if the defendant merely calls his clients and states**
> **that he has resigned from Merrill Lynch and now works for**
> **Dean Witter, the Court finds that his initiation of targeted**
> **contact through the use of client information gained through**
> **his employment with Merrill Lynch constitutes prohibited**
> **solicitation.**  Despite the "announcement" label the defendant
> places on it, **such initiated, targeted contact is tantamount to**
> **solicitation** because there is no reason to believe that a customer
> on the receiving end of such a phone call does not assume that the
> broker wishes for him to transfer his account.  A genuine
> announcement, by contrast, has a broader, general nature, such as a
> newspaper or trade paper advertisement.  Such an announcement
> simply does not have the same level of intrusive, proactive
> communication of such tacit expectations.

Merrill Lynch v. Schultz, 2001 WL 1681973 (D.D.C. 2001) (emphasis added).  The District of

Maryland considered a virtually identical case:

> It is likely that the arbitration will result in a holding that Sivel
> violated the Agreement by a targeted mailing of announcement
> notices directed to his Merrill Lynch Accounts.  Such a mailing is
> to be distinguished from a general public announcement of Sivel's
> change in employment.  A public announcement could properly
> have been done through a general advertisement or even through a
> mailing to a list (which may  have included Accounts) obtained
> from a source other than Merrill Lynch records.  A mailing
> specifically directed to Accounts, however, is likely to be found to
> be solicitation.

Merrill Lynch v. Sivel, Civ. A. No. MJG-99-185, at 7 (D. Md. 1999).

Moreover, Defendants have admitted to behavior that in no way could be interpreted as

mere informational contact.  Defendants admit that after they resigned, they used HRBFA

records to send 397 letters to HRBFA customers enclosing account transfer documents.  Those

letters included account transfer forms from SunTrust, making clear that the purpose and intent of the letters was to solicit the transfer of the clients' accounts and assets to SunTrust. These letters, by definition, constitute solicitation. Defendants also admit to calling 75 HRBFA customers before they resigned, and admit that some of these customers told them they wanted to transfer their accounts to SunTrust. Moreover, it is the targeted nature -- not the exact content -- of the communication that makes it a solicitation in violation of Defendants' agreements. In addition, telephone calls are of necessity even more clearly a solicitation than a written communication because they create a socially manipulative situation in which the customer would have to act in an anti-social manner to simply say to the caller "thanks for the information" and hang up. Defendant knew this and is exploiting the natural politeness of most customers by making telephone calls to them. These communications are targeted and, especially when coupled with the targeted mailing, they are clearly solicitations.

Finally, although Defendants try to create the impression that continuing the restraints will prevent them from informing clients of their new employment, the truth is that *the clients likely already know where they are*. Defendants admit to contacting every single client, and some of them obviously were contacted repeatedly through telephone calls both before and after their resignations, and letters with account transfer forms immediately following their resignation. There is no reason that Defendants should be permitted to repeatedly contact HRBFA clients.

### 5. Enforcing Defendants' Valid Employment Agreements is in The Public Interest.

The law is clear that there is a strong public interest supported by issuing the requested injunction. The public interest is directly served by the enforcement of valid contractual obligations:

> The court agrees with the plaintiff that by issuing an injunction, the court serves the public interest in protecting trade-secret client lists and other confidential information, an interest reflected by the adoption of the D.C. Uniform Trade Secrets Act. … A final factor tipping the public-interest scales to the plaintiff's side is the court's desire to see the terms of a reasonable contract enforced.

Rothe, 150 F. Supp. 2d at 79-80. Bowe Bell & Howell Co. v. Harris, 145 Fed. Appx. 401, 404 (4th Cir. 2005) (upholding injunction on the grounds that "the public has an interest in enforcing restrictive covenants that protect business interests"). There also is a public interest in protecting against the misappropriation and misuse of trade secret customer information, and in protecting the confidentiality of client data. Merrill Lynch v. Wertz, 298 F. Supp. 2d 27, 34-35 (D.D.C. 2002) ("the Court believes the public interest is served by protecting confidential business information and trade secrets, and enforcing valid contractual provisions, to which parties have voluntarily entered"). This public interest is reflected in the Legislature's enactment of the Uniform Trade Secrets Act, D.C. Code §§ 48-501 et seq.

In an effort to divert attention from their own misconduct, Defendants try to hide behind the purported interests of customers as a means of evading liability. Defendants cite NASD Rule 11870 and Interpretative Material 2110-7, both of which deal solely with the transfer of an account at a client's request. This subject is not at issue here, because HRBFA *has not asked the Court to stop transfer orders from being honored*. Defendants assert, however, that these NASD statements support the Defendants' broader proposal that any contact between a broker and customer is permitted regardless of restrictive covenants to the contrary. No such language is found in either rule. Rule 11870 deals solely with account transfers and contains no broader language. Furthermore, and contrary to Defendants' arguments, NASD Interpretative Material 2110-7 specifically confirms the NASD's support for non-solicitation agreements:

> As a condition of employment, certain members require their

registered representatives to sign employment contracts in which each registered representative agrees that when he or she leaves the firm, he or she will not take, copy, or share with others any firm records. In addition, **the registered representative may agree that, for a certain period of time following his or her departure from the firm, he or she will not solicit the firm's customers or business**.

* * *

The Interpretative Material **does not affect ... the ability of member firms to use employment agreements to prevent former representatives from soliciting firm customers**. The Interpretive Material is limited to restricting a member from interfering with a customer's right to transfer his or her account, **once the customer has asked the firm to move the account**.

Interpretative Material 2110-7 (emphasis added). IM 2110-7 is a clear mandate from the NASD supporting HRBFA's right to seek restraints and enforce its valid non-solicitation agreement against Defendants.[7]

Defendants also cite Prudential Securities, Inc. v. Plunkett, 8 F. Supp.2d 514 (E.D. Va. 1998), which is factually and legally distinguishable. First, the contract at issue in Plunkett required the application of New York law. Indeed, the Court applied New York law and relied squarely upon American Express Financial Advisors v. Thorley, 971 F. Supp. 780 (W.D.N.Y. 1997), a decision which was subsequently *reversed* by the Second Circuit. American Express Financial Advisors v. Thorley, 147 F.3d 229 (2nd Cir. 1998). Indeed, the New York Appellate Division's decision in Leake v. Merrill Lynch, 623 N.Y.S.2d 229 (N.Y. App. Div. 1995) makes clear that New York law also calls for preliminary injunctive enforcement of non-solicitation

---

In Rothe, the defendant cited to language in the NASD's news release concerning the right of customers to freely transfer accounts, arguing – like defendants in this case – that the language supports the defendants' right to contact customers. Rothe, 150 F. Supp. 2d at 79. The Rothe court rejected this interpretation, holding that the defendant's reliance was misplaced because the NASD comments also expressly upheld an employer's right to restrict post-employment solicitation. Id.

restraints under these circumstances.[8]  Finally, in Plunkett, there was no evidence that the defendant had solicited, and the court emphasized that the defendant had not "surreptitiously accepted employment with a competitor before he resigned."  8 F. Supp.2d at 519.  In this case, by contrast, Defendants not only secretly accepted employment with a competitor, they also solicited HRBFA's customers and used HRBFA's confidential customer documents to bring business to their new employer before they resigned.  Defendants admit to misappropriating copies of confidential HRBFA records to contact nearly 400 HRBFA customers after their surprise resignations on January 10, 2006.

Finally, there is no prejudice to any clients that will flow from continuation injunctive relief.  Any customer who wishes to transfer will be free to do so.  Those customers who elect not to transfer will have access to fully qualified financial advisors at HRBFA.  There is no meaningful impact on client interests in this dispute.

### 3.    The Unclean Hands Doctrine Does Not Apply Unless it Concerns The Same Contract or The Same Customer Lists/Trade Secret Property at Issue in HRBFA's Claims.

Defendants contend that HRBFA sponsors the same behavior in other unrelated matters and, therefore, should be barred from enforcing valid non-disclosure, non-solicitation and trade secrets obligations in this case by the doctrine of unclean hands.  Defendants have not – and cannot – allege that HRBFA has "unclean hands" with respect to the instant litigation, or that Defendants have been personally injured by HRBFA's alleged hiring of brokers from other securities firms in the past.  Therefore, any assertion of HRBFA misconduct in this case is improper and untrue.

Defendants' allegation also fails as a matter of law, because the doctrine of unclean hands

---

[7]  Plunkett also is inconsistent with the binding Fourth Circuit precedent in Bradley.

does not apply unless it concerns the <u>same</u> actual contract or trade secret property at issue in the pending litigation. <u>See</u> <u>International Tours & Travel, Inc. v. Khalil</u>, 491 A.2d 1149, 1155 (D.C. 1985) ("The equitable doctrine of unclean hands only applies where there is misconduct by the plaintiff in the same transaction that is the subject of his claim."); <u>Ross v. Fierro</u>, 659 A.2d 234, 241 (D.C. 1995)(defendant "can prevail with the defense of unclean hands only if the conduct on the part of [the plaintiff] of which [the defendant] complains was the cause of the obligations from which [the defendant] seeks to be relieved."). Defendants have not alleged any purportedly "unclean" conduct with respect to the formation of the contracts at issue in this case, or with respect to the compilation of the trade secret data they misappropriated.

Michigan courts also have refused to apply the unclean hands defense under factually analogous circumstances. <u>See</u> <u>Merrill Lynch v. Ran</u>, 67 F. Supp. 2d 764, 776 (E.D. Mich. 1999). In <u>Ran</u>, the defendants asserted the unclean hands defense arguing that Merrill Lynch participated in the industry practice of recruiting brokers from other brokerage firms and soliciting their former clients. <u>Id.</u> The court found that the alleged evidence of unclean hands was irrelevant to the issues before the court. <u>Id.</u> The <u>Ran</u> court held that the defendant's allegations of unclean hands were not grounds for refusing to enforce the valid restrictive covenants at issue in the case. <u>Id.</u>

Courts across the country similarly have rejected attempts by brokers and brokerage firms to invoke the unclean hands doctrine. In <u>Merrill Lynch v. Stidham</u>, the Fifth Circuit, Unit B – now the Eleventh Circuit –summarily rejected a former broker's "unclean hands" defense, stating:

> Through the noncompetition covenant here at issue, then, Merrill Lynch sought no more than to prevent employees it trained at considerable expense from filling the coffers of a competitor by virtue of Merrill Lynch's efforts ... Respondents have also argued

> two points with respect to the propriety of equitable relief which
> need not detain us in text - (1) the adequacy of damages for breach
> of contract: (2) the "unclean hands" of Merrill Lynch as an
> equitable defense.

* * * *

> With regard to the question of "unclean hands," Respondents
> sought to introduce testimony that Merrill Lynch itself actively
> recruited experienced stockbrokers and that it was customary in the
> securities industry for stockbrokers to carry records with them
> from job to job. This argument is curious. Its suggestion is that
> breach of contract, with apparent impunity, is tolerated on a day to
> day basis in the securities industry, a suggestion which we doubt
> seriously. Moreover, even if such is the case Merrill Lynch's
> alleged uncleanliness has not been asserted to involve the
> transaction at hand. Such is the requirement of law, so this
> equitable defense fails.

Merrill Lynch v. Stidham, 658 F.2d 1098, 1102 n.8 (5th Cir., Unit B, 1981). See also Ruscitto v.

Merrill Lynch, 777 F. Supp. 1349, 1354 (N.D. Tex.) ("The court has carefully considered

Ruscitto's clean hands argument as well as his contention that a preliminary injunction will

accord Merrill Lynch all the relief it seeks. The court is not persuaded that either contention

warrants denial of injunctive relief."), aff'd, 948 F.2d 1286 (5th Cir. 1991), cert. denied, 504 U.S.

930 (1992).

In a trade secrets and non-solicitation agreement case in another industry, Amerigas

Propane, Inc. v. J.T. Cook, 844 F. Supp. 379 (M.D. Tenn. 1993), the court rejected the former

employees' assertion of the "unclean hands" defense:

> [T]he defense of **unclean hands must be immediately related to
> the subject-matter of the suit**, and affect the equitable relations
> between the parties to the litigation. Seaton v. Dye, 37 Tenn. App.
> 323, 263 S.W.2d 544, 551 (1953). Consequently, in the case at
> bar, the Court concludes that AmeriGas's alleged wrongful
> behavior vis-a-vis UCG is not germane and Respondent cannot
> maintain the defense of unclean hands.

Id. at 387-388 (emphasis added). See also Computer Assocs. Intern. v. Bryan, 784 F. Supp. 982, 998 (E.D.N.Y. 1992) ("[T]he doctrine of unclean hands is only applicable when the conduct relied on is directly related to the subject matter in litigation -- in this case meaning that it would **have to be related to the creation or acquisition of the trade secrets themselves**.")(emphasis added).

Under District of Columbia or Michigan law, and under decisions around the country, in order successfully pursue this defense, Defendants must prove not only that HRBFA engaged in misconduct as to some other third party on some other occasion but also that this alleged wrongdoing is directly related to the particular client relationships that Defendants improperly solicited or to the confidential information that Defendants misappropriated in this case. In sum, unless the circumstances involve the same obligations, the same property, and the same parties, the unclean hands doctrine simply cannot apply. Defendants have not – and can not – prove these legal requirements. Accordingly, Defendants' assertion of the unclean hands defense is improper and should not be considered by the Court.

Nor can Defendants overcome the inadequacy of their effort to assert the defense of unclean hands, by trying to re-package the argument based on an alleged custom and practice in the securities industry. Despite Defendants' contentions to the contrary, there is no uniform custom or practice in the industry with respect to hiring from the competition. The actual practice depends upon the firm, the contractual duties at issue, and the particular type information that is involved in any given situation. While some firms, such as HRBFA, consider their customer information to be trade secrets and vigorously protect any misappropriation of such information, other firms specifically provide by contract that a broker is permitted to take customer information with him or her and solicit the customers if that broker resigns from the

firm. As stated above, HRBFA is not a party to the Broker Protocol that Defendants refer to in their opposition brief and HRBFA has repeatedly acted to protect its customer information.[9]

Moreover, there simply is no basis for looking to any alleged the custom or practice to interpret an unambiguous contract. See Merrill Lynch v. Ran, 67 F. Supp. 2d 764, 776 (E.D. Mich. 1999) (finding that even if brokerage firm engaged in same industry practice of recruiting brokers from other securities firms, such "industry practice is not grounds for refusing to enforce valid restrictive covenants"); Merrill Lynch v. Rodger, 75 F. Supp. 2d 375, 381 (M.D. Pa. 1999) (refusing to consider the alleged industry custom and practice of ignoring restrictive covenants, and instead enforcing restrictive covenant and granting preliminary injunctive relief). In short, to the extent that there is any custom or practice in the securities industry, it is to follow the law and hold brokers and the firms that hire them accountable for breach of contract, breach of duty of loyalty or misappropriation of confidential information or trade secret rights.

## CONCLUSION

For the reasons stated above, HRBFA respectfully requests this Court grant injunctive relief against Defendants pending an expedited arbitration hearing on the merits of this dispute before a panel of duly appointed arbitrators pursuant to Section 10335 of the National Association of Securities Dealers Code of Arbitration Procedure.

Respectfully submitted,

/s/

_____

Robert C. Gill
Saul Ewing LLP

---

[9] In addition, this purported custom is only part of the story. The other custom and practice is that people who engage in this practice get sued and enjoined, as evidenced by the myriad decisions from around the country granting injunctions under these circumstances.

1025 Thomas Jefferson Street, N.W.
Suite 425W
Washington, DC 20007
(202) 295-6605
*Attorneys for Plaintiff*
*H&R Block Financial Advisors, Inc.*

Of Counsel:

Christopher P. Stief
Saul Ewing LLP
Centre Square West, 38th Floor
1500 Market Street
Philadelphia, Pennsylvania 19102
(215) 972-1965/7834
(215) 972-1941/1919 (facsimile)
estief@saul.com


Dated: January 23, 2006